See also 862 F.Supp. 1251.

**In the Matter of the Complaint of NAUTILUS MOTOR TANKER CO., LTD., as Owner of the M/T BT NAUTILUS for Exoneration from or Limitation of Liability.**

**COASTAL (BERMUDA) PETROLEUM LIMITED, Plaintiff,**

**v.**

**James T. NAUGHTON, and Albert G. Ainscough, Defendants.**

**Civ. A. Nos. 90–2419 (WGB), 91–1015 (WGB).**

United States District Court, D. New Jersey.

Sept. 27, 1994.

Haight, Gardner, Poor & Havens by John J. Reilly, Charles B. Anderson, Judith K. Braun, Michael L. Sommer, New York City, Goldstein, Till, Lite & Reiken by Andrew J. Goldstein, Newark, NJ, for plaintiff.

Hill, Rivkins, Loesberg, O'Brien, Mulroy & Hayden by Robert E. Daley, Richard Webber, New York City, for defendants.

## OPINION

BASSLER, District Judge.

### I. INTRODUCTION

In the early morning of June 7, 1990, after heaving anchor at Stapleton Anchorage in the Port of New York, near the Verrazano Bridge, and scheduled to berth at the terminal of Coastal New York in Bayonne New Jersey, the 811 foot Motor Tanker BT Nautilus ran aground in the Kill van Kull, rupturing the No. 4 starboard cargo tank, and discharging an estimated 230,000 gallons of No. 6 fuel oil. (Ex. 435 at 1). Limitation Plaintiff, Nautilus Motor Tanker Ltd. ("Nautilus"), as owner of the vessel, put up a $26,000,000 bond to cover the claims for damages from the oil spill. (Tr. 2493:10–19).

Nautilus filed a counterclaim seeking exoneration from or limitation of liability pursuant to 46 U.S.C.App. § 183. Nautilus, as Limitation Plaintiff, seeks to impose liability on Limitation Defendant, Coastal New York Inc. ("Coastal"), on the theory that it breached its duty as wharfinger because the vessel either grounded in the ship berth or, if it grounded outside the ship berth, the approach to the berth was unsafe. Coastal, on the other hand, contends that negligent navigation caused the vessel's grounding outside both the Coastal New York ship berth and the federal navigation channel, in a shallow area, shown on the navigation chart in use and known to the vessel's docking pilot.[1]

The non-jury trial took nineteen days, produced 27 witnesses and generated 247 exhibits. To the resolution of the issue of liability only the court now bends a laboring oar in the following findings of fact and conclusions of law.

To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## FINDINGS OF FACT

The court finds by a preponderance of the credible evidence the following facts:

### THE PASSAGE OF THE BT NAUTILUS THROUGH THE KILL VAN KULL AND THE GROUNDING

1. Limitation Plaintiff, Nautilus, was a corporation duly organized and existing under and by virtue of the laws of Gibraltar, and was the owner of the M/T BT Nautilus.

2. The BT Nautilus, built in 1979 at Odense, Denmark, is[2] an oil tanker of steel construction, 811 feet in length, 105 feet in breadth, 36,376 gross tons, and was at all relevant times a vessel registered under the laws of Hong Kong.

3. Coastal New York was a corporation organized and existing under the laws of one of the United States, with a principal place of business in Hasbrouck Heights, New Jersey, and was the owner and operator of a marine terminal in Bayonne, New Jersey, located on the north side of the Kill van Kull waterway between the States of New York and New Jersey.

4. The berthing facilities at the Coastal terminal consisted of a ship berth, a barge berth (sometimes referred to as the "new barge berth"), two smaller barge berths and an area south and east of the barge berth, which is referred to as the barge berth approach or barge berth entrance.

5. The Coastal New York terminal is located on the northern shore of the Kill van Kull between the states of New York and New Jersey. There is a government-maintained navigation channel in the Kill van Kull which is approximately 800 feet wide in the area of the terminal. The depth of the northern half of the channel is approximately 42–43 feet in the area of the terminal. (Exs. 85, 284, 288, 305 and 618).

6. The BT Nautilus, loaded with approximately 230 metric tons of residual fuel oil, arrived in the Port of New York on the morning of June 4, 1990, but could not proceed directly to the Coastal terminal to discharge cargo because the terminal's ship berth was occupied by another vessel. Instead, the ship anchored at Stapleton Anchorage pending availability of the Coastal New York ship berth.

7. Moran Towing & Transportation Co., Inc. dispatched two tugs, the Kerry Moran and the Scandia, and a docking pilot James Naughton, to assist the BT Nautilus in making the passage from the Stapleton anchorage to the Coastal New York terminal and in docking at the terminal.

---

1. It was stated in the investigating report of the United States Coast Guard that "[t]he apparent cause of this grounding was the failure on the part of the Docking Pilot to maintain the B.T. Nautilus within the navigable limits of the channel as he brought the vessel into the Coastal Terminal. The Docking Pilot was not familiar with the shape or dimensions of the dredged underwater basin leading from the channel to the Terminal. (Ex. 672 at 1, ¶ 2).

2. Findings of Fact 1–10 are either stipulated to or are uncontested.

8. At 0354 local time on the morning of June 7, 1990 the BT Nautilus departed from Stapleton Anchorage on route to the Coastal New York terminal at Bayonne by way of the Kill Van Kull.

9. Departure from the Stapleton Anchorage was about 4¾ hours before high water (high tide) at the Battery, i.e. 0354 and 0838 respectively.

10. Although there was testimony that the docking pilot and other pilots frequently docked vessels at the Coastal Terminal during all stages of the tide and current, Captain Roy Lee Redman, Coastal's expert on docking and piloting of vessels in the Port of New York generally, and the Kill Van Kull specifically, credibly testified that because of the size of the berth and the "rocks and shoals in the whole area around there," the proper method of a berthing at the Coastal facility was to leave the Stapleton Anchorage about one and a half hours before high water slack in order to arrive at the pier about high water slack, a time when the tidal current is either nonexistent or minimal in either direction. (Tr. 2309:23–2310:10).

11. Coastal's expert docking pilot, Richard Hugh Riley, explained why a laden tanker drawing 35 feet, 3 inches forward and thirty six feet aft on route to the Coastal facility, should leave the Stapleton Anchorage one and a half hours before high water slack: to afford maximum water under keel and minimum current for maximum control when berthing at the Coastal dock. (Tr. 2440:1–22).

12. That the appropriate time for departing the Stapleton Anchorage is about one and a half hours before high tide at The Battery is also documented in the Shipping Guides Ltd.

The *Guide to Tanker Ports* states:

Belcher (now Coastal) Bayonne Terminal: ... Transit from Anchorage to Terminal: The Pilot/Mooring Master will board and heave anchor approximately 1.5 hours to HW (Battery). Then proceed into Kill Van Kull ...

(Ex. 256).

13. The flood tide current in the Kill van Kull runs generally from east to west and was, therefore pushing the BT Nautilus from astern, so long as the ship remained parallel to the current.

14. At the time of initial contact, the BT Nautilus was moving in the ahead direction and to the starboard. In other words the ship was "crabbing", (Tr. 2022:1–2026:21; Ex. 708), as evidenced by the "furrow" scratching and scoring on the hull which were parallel and at the same angle to the centerline. (Ex. 140).

15. The available tidal current data reflected that at a location off of New Brighton, about a nautical mile from the grounding, the maximum flood was at 4:27 and at Bergen Point about a half mile from the grounding the maximum flood was at 4:27, so that the grounding at 5:15 on the morning of June 7th, was approximately 45 minutes after the time of the maximum flood. (Tr. 312:19–25; Tr. 330:25–331:15).

16. Dr. James Mays, Nautilus's expert witness in the area of physical oceanography and ocean engineering, testified that by using a computer model, he reconstructed the speed of the current at the location of the grounding to be only 1.01 knots. (Tr. 318:18–23). Although the tidal current tables published by the National Oceanic and Atmospheric Administration advises that because "[c]urrents are frequently disturbed by wind or variations in river discharge on days when the current is affected by such disturbing influences" and that "[t]he times and speeds will differ from those given in the table ... local knowledge would enable one to make proper allowance for these effects." (Tr. 333:16–25). Dr. Mays acknowledged that he made no effort, in formulating his opinion, to consult with any masters or pilots familiar with the Kill van Kull. (Tr. 334:3–13). Nor were any meters deployed to measure the speed of the tidal current in the immediate vicinity of the Coastal facility. (Tr. 326:3–6).

17. The testimony regarding the estimated speed of the tidal current by Dr. Mays is impugned by the statement of the docking pilot, Captain Naughton, in the transcript of the U.S. Coast Guard tape. (Ex. 100A at 53:17–25).

18. Dr. Mays was unaware of the observations made by persons on board the BT Nautilus with respect to the tidal current. (Tr. 329:11–19).

19. The BT Nautilus went aground at 5:15. After the engines were stopped, depths were reported of 9.5 feet under the keel forward and aft 6.5 feet under the keel. (Tr. 445:3). The Captain of the BT Nautilus, Albert Frank Ainscough, tried to take bearings of some shore objects but they were inconclusive. He went to the charts and wrote the bearings and the distances and also "scribbled them down on a piece of paper." But according to Captain Ainscough, because the IMTT berth is not shown on the charts, and because one of the charts showed two dolphins at the Coastal berth, when there was only one, he couldn't fix the position of the ship. (Tr. 446–447). The Captain was not able to find the piece of paper when the Coast Guard came on board shortly after the berthing. (Tr. 463:18–25). He attempted to plot the ship's position on the British Admiralty chart but because it wasn't a good fix, the Captain said he just automatically erased the penciled in position. (Tr. 609:2–610:2).

20. As of 0511, approximately four minutes before the grounding, the tidal current was strong enough to cause the docking pilot, Captain Naughton, concern. The Coast Guard tape recorded Captain Naughton's response to a smaller vessel, the Poling Eight, who wanted to cut into the BT Nautilus as she was making her final approach to the Coastal ship berth: "Well, there's not too much we can do here. We've got a rip snorten, roaring flood tide here." (Ex. 100A at 53:17–25). The Court does not credit Captain Naughton's trial testimony, (Tr. 680:9–22), that this statement did not reflect a concern over the tidal current but rather, was an attempt by him to dissuade the Poling Eight from cutting in front of the BT Nautilus. Similarly, the Court does not credit Captain Ainscough's testimony that this was merely "a figure of speech." (Tr. 573:8–10). In fact, Captain Ainscough stated that Captain Naughton had told him to expect a strong tidal current in the Kill Van Kull. (Tr. 573:11–16).

21. When the BT Nautilus ran aground at 0515, the only immediate indication of grounding was a slight port list (Tr. 443:1; 2–9). The Captain's first action was to stop the engines (Tr. 444:19–20). The ship itself was "stopped totally." (Tr. 445:11–13; 762:18). After the Captain's abortive attempt to fix the ship, the pilot told the Captain that oil was "coming up in the water." (Tr. 447:6–8). The tide in the Kill van Kull was coming in and going west. (Tr. 647:3–7).

22. Several minutes after the Nautilus stopped, estimated by the docking pilot, Captain Naughton, to be from two to three or as much as four to five minutes, (Tr. 761:2–5; 762:14–15; 768:12–13), the Nautilus began to rotate. With the current hitting the ship on the port quarter, it "started going towards the northside of the channel" (i.e. in a counter-clockwise direction). (Tr. 761:13–15).

23. When the ship grounded, the pilot "looked around," and believing that the ship was still in the Federal Navigation Channel, (Tr. 769:5–15) said to Captain Ainscough: "We shouldn't have touched anything, Captain, we're still in the channel." (Tr. 445:14–16).

24. A copy of the *Guide to Tanker Ports* was on board the BT Nautilus, as it was in every tanker on which Captain Ainscough had served as master. The *Guide*, as Captain Ainscough acknowledged, states that the ships are "always starboard side to, and breasted in at the Belcher Coastal terminal." (Tr. 428:16–24). Breasted in means that the ship is put parallel with the berth and then pushed in by tugs. (Tr. 428:24–24). The *Guide to Tanker Ports* with respect to docking at "Belcher Bayonne Terminal" (now Coastal) states:

> Docking and Mooring. All vessels dock starboard-side-to with the assistance of 2 tugs. Vessels approach the terminal at time of HW slack with minimal headway. Due to the shape of the dredged basin all vessels are normally spotted off the berth and then moved broadside into position alongside the breasting islands . . . .

(Ex. 256 at "NAU–04507").

25. The Moran "bibles" which contain docking information supplied by Moran dock-

ing plots and ship terminals, recommends that ships entering the Coastal Oil ship berth, breast in. The "Moran Bible" includes the same docking instructions as the *Guide to Tanker Ports* for the Coastal Oil ship berth. (Ex. 524A at NAU–25199).

26. Captain Naughton's approach to the terminal was at an angle and did not utilize the "breasting in" approach. (Tr. 428:21–23). When Captain Ainscough had previously called the Coastal terminal the BT Nautilus was spotted off the berth and then breasted in. (Tr. 428:16–429:18).

27. On the morning of June 7, Captain Naughton was in radio communication with the Coast Guard. At about 0527 the Coast Guard responded to the BT Nautilus as follows:

> *Group New York:* BT Nautilus, Group New York. I understand you're at IMTT, between IMTT and also Coastal Bayonne. What is the distance from your pier? Over.

28. At about 0517 and 0532 the following communication took place:

> *Group New York:* BT Nautilus, this is Group New York. I understand you had a ground up at the Belcher Bayonne, and ah, is there any hull damage? (Final Pretrial Order Stipulation No. 46).

and

> *Speaker:* BT Nautilus, Group New York. I understand you are pretty much right there to the piers. If you can safely maneuver to the piers, by all means, maneuver to the piers. Over.

29. At about 0534, the Coast Guard initiated a marine safety broadcast for "New York, New Jersey, Kill van Kull":

> The tanker BT Nautilus is reported aground in the Kill van Kull in the vicinity of IMTT. All mariners are requested to use caution when transitting the area. Break. This is the United States Coast Guard, New York Group.

(Stipulated Fact 48; Ex. 100A at 71:10–19). This Coast Guard communication was based upon information given to the Coast Guard by the docking pilot on board the BT Nautilus. (Tr. 812:9–25; 1–21).

30. At about 0605 the BT Nautilus refloated on the still rising tide and was docked without further incident at the Coastal New York ship berth. (Stipulated Fact 52).

31. At no time that the BT Nautilus was aground was the ship's position fixed and plotted in the navigational sense: it was not marked on a chart using ranges and bearings (radar or visual) to fixed objects. (Tr. 834:1–835:3). According to Captain Naughton he did not attempt to take a fix of the grounded position of the vessel because he was "busy trying to straighten the ship out and answer radios and talk to people". (Tr. 834:24–835:3).

32. Captain Ainscough testified that he attempted to fix the grounded position but was unable to do so and then gave up the effort in order to assess the source and extent of the escaping oil. (Tr. 445:17–447:13).

33. The court does not credit Captain Ainscough's testimony that a fix could not be determined. Coastal's expert witness, Captain Jay D. Bolton, credibly testified that obtaining a fix based on visual bearings at a position off the IMTT Pier A facility in the Kill Van Kull is a simple procedure, (Tr. 2200:18–23), because there were any number of marks available for visual bearings. (Tr. 2204:11–2205:22). Further, Captain Bolton testified that the radar "could have been used for some benefit." (Tr. 2208:1–8).

34. It was Captain Naughton's opinion that, although the IMTT facility does not have range lights, sector lights or any aids to navigation over and beyond what is at the Coastal facility next door, the IMTT facility is a safe berth. (Tr. 811:25–812:8).

35. The ship's course recorder, which maintains a continuous record of the ship's heading, had not been turned on before getting underway at the Stapleton anchorage; therefor, it was not operating prior to the grounding. (Tr. 550:14–17; Tr. 425:12–426:12).

36. A course recorder is a device that keeps track of the direction in which a vessel is moving, including the time and location or position of the vessel as time passes by, enabling a reconstruction prior to, or in the

course of a vessel's movements of an incident. (Tr. 1382:10–15).

37. Had the course recorder been operating on board the BT Nautilus the morning of June 7th, 1990, there would have been a documentary record that would have supported or negated the opinion of Nautilus expert Herman Bomze that the vessel commenced to rotate immediately after the initial impact. (Tr. 1382:21–1383:10).

38. The Captain's Standing Orders referred to "Wallem Ship Management, Limited, 'Company Procedures Manual For Navigation,'" a "procedure manual for navigation" binding upon the captain and the other ship's officers, that referred to the "ICS Bridge Procedures Guide." A particular bridge checklist identifies the course recorder as one of the items to check before entering port. (Tr. 525:14–527:2).

39. The "ICS Bridge Procedures Guide" includes checking the course recorder as part of the checklist because, as Captain Ainscough noted, "it can be used as a record in the event of an incident." (Tr. 525:14–Tr. 527:10).

40. Although the vessel was equipped with a fathometer, which in certain circumstances Captain Naughton acknowledged enables one to "reconstruct an incident," it was not turned on prior to the vessel's heaving anchor on the morning of the June 7, 1990. (Tr. 567:1–21).

41. Thomas Edward Junay, president and owner of TNJ Marine Commercial Diving, was requested by the Coastal terminal manager, Mr. Shafto, to conduct a survey on the vessel, the morning of June 8th. (Tr. 1549). After completing the survey of the bottom of the vessel, Junay proceeded to do a search pattern where two buoys had been placed by Hydrographic Surveys, an organization primarily engaged in fathometric surveys of marine terminal berths. (Ex. 413; Tr. 1550). Mr. James Steffen, a principal of Hydrographic Surveys, evaluated the likely areas of probability for points of impact of the BT Nautilus, and had estimated that the point of impact "was likely to be near Station 7+45 East by +190 feet from the faceline of the berth as those coordinates are shown on drawing #566–P." (Ex. 413 at 3).

42. On his first dive, Junay did a circular search around the buoy looking for any type of scarring of rocks or absence of marine growth, knowing that it had to be a "pretty substantial amount of growth" seeing how much damage the ship had sustained. (Tr. 1550:4–24.). However, he found no evidence of a grounding. (Tr. 1550:15–25).

43. Junay then went to the second buoy where he found a "plume" or path of "No. 6 oil product" which he followed in an easterly direction until he came upon two very large stones and a high concentration of bottom paint. The stones were completely denuded of marine growth and there were pieces of metal shavings. (Tr. 1551:5–24). With Mr. Junay on the bottom of the Kill Van Kull and Hydrographic Surveys on top, Junay anchored a buoy over the area evidencing ship impact damage, which was determined to be at "Station 8 + 45 East by +182 feet from the faceline of the berth." (Ex. 413 at 5; Tr. 1551:4–1553:24). This "point of impact," as it is designated on the hydrographic survey, is to the east of the Coastal ship berth and outside of the federal channel. (*See* Ex. 92).

44. The position of the "point of impact" found by the diver was fixed, relative to an established position or "station" ashore using a buoy whose "sinker" or anchor, had been placed at the "point of impact" by the diver, determining the angle and distance from the "station" ashore to the buoy. (Tr. 1552:19–1554:3; Tr. 1672:24–1673:11). This position, which is accurate to plus or minus ten feet in the horizontal plane, was thereafter plotted on Hydrographic Surveys Drawing No. 572. (Tr. 1680:6–1681:8; Ex. 92).

45. While Nautilus pointed out some inconsistencies in Junay's testimony and some errors by Steffen at trial, the court finds their testimony credible and is satisfied that the position so ascertained and plotted is accurate.

46. On June 9, when Junay was videotaping the impact area, he took "metal shavings, fresh paint chips," placed them in plastic bags, sealed them underwater, and brought them up." (Tr. 1561:19–22).

47. On June 9, 1990, Junay and hydrographic surveyors returned to the Bayonne terminal, primarily to make an underwater videotape of the "point of impact" found the previous day. (Tr. 1554:14–1555:22). They discovered that the buoy placed on June 8, 1990 had been removed or lost during the evening, and repositioned it. (Tr. 1555:12–17). The videotape shows marks of impact and paint smears on the rocks, piles of paint at the sides of the rocks, and pools of coagulated heavy fuel oil commingled with paint chips. (Exs. 51, 51A). The area shown on the videotape was that of a very recent major impact and grounding by a vessel. (Tr. 1551:9–1; Tr. 1560:19–1561:12).

48. Mr. James Doran, a commercial diver, was employed by TNJ Marine, to obtain more paint samples, metal chips and oil from the suspected impact area. (Tr. 1898:14 to 1899:19). He obtained the samples on June 29, from an area marked by a buoy, which he identified as the area on Junay's videotape of June 9. (Tr. 1899:11–1901:5; Ex. 51).

49. According to the forensic investigators the paint and fuel oil samples taken "from the point of impact" were from the hull of the BT Nautilus. (As to the samples taken on June 29, 1990, *see* Exs. 435, 603; as to sample taken on June 9, *see* Stipulation at Tr. 1808:13–1809:8; *see also* Stipulation between counsel as to chain of custody, Ex. 703).

50. It is Junay's professional opinion, "based on [his] experience, observation and physical evidence gathered here, that the ship, motor vessel BT Nautilus, did run aground in this area located and surveyed on June 8th, 1990." (Tr. of Trial Ex. No. 51, VHS Tape, 5:21–28).

51. Kurt Jeffrey Erlandson, a commercial diver employed by Randive, Inc., was retained by the Nautilus interests to inspect the vessel for damage and to conduct an underwater inspection. (Tr. 336:19; Tr. 337:16–19; Tr. 345:12–24).

52. On June 8, 1990, pursuant to Captain Ainscough's request Erlandson examined the area on which the Captain suspected the vessel went aground. Following his radio communications, a buoy was placed to mark the area and Erlandson inspected the general vicinity that the Captain wanted him to look at. (Tr. 337:24–25; Tr. 339:24–340:5; Tr. 347:17–351:6). However, Erlandson found no evidence of a ship grounding, or of impact in the area referenced by Captain Ainscough. (Tr. 351:9–21).

53. The following day on June 9, 1990, the ship's representative requested Erlandson to do a "verification dive" of the "point of impact" located by Junay on June 8. (Tr. 342:6–21; Tr. 355:9–21). The "point of impact" area was "considerably to the east" or northeast of where Erlandson had done his dive the day before on June 8th. (Tr. 364:18–21). Because of the paint chips and the metal shavings in that area, Erlandson, who as a diver had investigated groundings over the years, was of the opinion that the area was the scene of a vessel grounding. (Tr. 364:9–17). Since Erlandson had videotaped a tire also observed by Junay to the south and east of the "point of impact," it is evident that both divers were in the same immediate vicinity. (Ex. 47 (Randive videotape of Bottom Survey and Sea Bottom Survey dated June 9, 1990); Tr. 1556:11–1568:22; Tr. 1569:6–25).

54. It was not until September 28, 1990, more than 3½ months after the grounding, that the Nautilus interests conducted any underwater searches of the area in which Nautilus claims the vessel first contacted bottom. (Exs. 48 and 48A). In the course of that search, the diver found no evidence of impact or contact in the areas designated by counsel for Nautilus, (Tr. 1643:14–25), despite ideal conditions which included exceptional visibility. (Tr. 1644:19–20; Tr. 1646:18–23). In November 1990, another underwater search was undertaken by the Nautilus interests in the same area, and again the diver found no evidence of any kind of grounding. (Exs. 59, 59A; Tr. 1647:21–1648:1).

55. No persuasive evidence was ever found by any diver that the BT Nautilus grounded on the bottom of the Coastal New York ship berth. Nautilus's reliance on Doran's dive of November 5, 1990, is misplaced. When Coastal's diver, James Doran, conducted a dive on November 5, 1990, he was at one

point approximately 10 feet north of buoy 5, within Coastal's ship berth flare line. (Ex. 581, 581A). Doran's cable became entangled around a big rock, and on checking it, he stated: "This could be paint here, but I can't tell. It's very hard to tell anymore." (Ex. 582 at 45:26–46:20). And "Again I–I can't be sure anymore." (Ex. 582 at 46–27). "It's not that obvious caked-on stuff, that's on the pinnacle rock. Wait here's some more here too. All right here it looks like it was touched ... here. Later, he said, "Again I can't really tell.... Here's a spot of red here, and there." (*Id.* 47:13–17). "Where am I located? Near buoy five?" (*Id.* at 47:21), and to which the boat responded: "We have a problem sightin[g] you here because of the, visibility." (*Id.* at 47:26–27).... Diver: "It's the very highest point of the rock. It just touched it, one little spot of red right here." (*Id.* at 48:4–6). "Where is he?" ... five? ... four ... four. Near buoy? Yeah. He back-tracked again." (*Id.* 48:8–20). "All right Jimmy you back-tracked. You ah did come back. You came back, you're near buoy four again." (*Id.* at 48:26 to 49:1). Diver: "Well there's a little spot of red on the very top of this rock here, that's about it. Again, we're, not that far really from the pinnacle rock area." (*Id.* at 49:3–6).

56. Buoy four is outside of the Coastal ship berth, (Exs. 581, 581A), and during the trial Doran had previously identified the "impact rock area" by naming it "pinnacle rock" because it had a "pinnacle rock" there with "embedded paint in it", "pieces of metal embedded into it," along with remains of oil" on the bottom there. (Tr. 1900:18–23). At the trial Doran had also identified the "pinnacle rock" as the one that Junay had videotaped on his dive. (Tr. 1900:14–16). Without question, "pinnacle rock" was not within the Coastal ship berth.

57. On May 19, 1990 and again on July 9, 1990 the Steam Tanker Cove Liberty, with an overall length of 825 or 826 feet (about 15 feet longer than the BT Nautilus) docked at the Coastal New York ship berth without incident. (Tr. 2008:21–2009); Tr. 2256:16–23).

58. On July 19, 1990 a sister ship of the BT Nautilus, the motor tanker BT Nestor, also docked without incident at the Coastal New York ship berth. There is no evidence that the owners of the BT Nestor objected to the ship being ordered to dock at the berth.

59. The navigation chart in use on the bridge of the BT Nautilus immediately prior to the grounding, was British Admiralty Chart No. 2753, "New York–Raritan Bay to Newark Bay Including Arthur Kill". That chart includes an area immediately to the east of the Coastal New York ship berth and up to the northern edge of the federal channel having a reported depth of 26 feet. (Stipulated Fact 53).

60. The "point of impact" is within the above-described area, on the shoulder of the underwater transition slope leading from the northern edge of the federal channel, dredged to at least 40 feet in the immediate area, to the area shown on British Admiralty Chart No. 2753 with a reported depth of 26 feet. (Tr. 1559:12–21; Ex. 617). The "point of impact" is about 25 feet outside the northern edge of the federal channel line and at least 125 feet east of the Coastal New York ship berth. (Ex. 581; Tr. 1748:13–21).

61. The area of the "point of impact" is outside the federal channel, in a relatively shallow area through which a laden tanker with a maximum draft of 36 feet cannot be navigated safely. (Ex. 413A; Tr. 946:23 to 948:23).

62. Captain Naughton was aware that there was an area to the east of the Coastal ship berth which was more shallow than the ship berth. (Tr. 751:18–753:6).

63. The "point of impact" found on the bottom of the Kill van Cull is consistent with the credible eyewitness testimony of Theodore Rovatsos, a Coastal dockworker, as to the grounded position of the BT Nautilus. (*See* Tr. 1782:20–21; Tr. 25:1784:19–24). Although he could not testify "in terms of distance," (Tr. 1798:1–5), he was able to position the ship in relation to the barge and the channel. (Tr. 1788:6–11; Tr. 1789:12–13; Ex. 702). From where he was standing on the Bouchard barge he could see the ship's mid-shift draft marks, (Tr. 1788:6–12), and

positioned the bow as being out into the channel. (Tr. 1789:2–3; *see also* Exs. 92, 96 and 97). This credible eyewitness testimony is congruous with the "point of impact" found on the bottom of the Kill van Kull.

64. Mr. Rovatsos, who observed a number of vessels dock at the Coastal facility over the years, noted that the approach of the BT Nautilus "appeared to be unusual" and that "she wasn't moving, and it was in a rather peculiar position," something he hadn't seen, so he "knew some way that it was in trouble." (Tr. 1790:25 to 1791:1;1786:3–7).

65. At about 0555 on the morning of June 7, 1990, the BT Nautilus was in the position fixed as follows:

A. The ship's bow was approximately 500 feet from the tip of the Coastal New York main dock. (Ex. 100A at 90:13–15; Tr. 694:2–15; Tr. 1129:1–1132).

B. The ship's stern was approximately 150 feet from the western-most mooring dolphin of the IMTT Pier A. (Tr. 781:1–12; Tr. 781:23–782:3; Tr. 796:18–797:4; Ex. 698 at 100:15–15, 129:15–23; 133:13–22; 147:14–24; Ex. 092; Tr. 1860:16–19; Tr. 1869:16–1870:4).

C. The western-most mooring dolphin of the IMTT Pier A was about 10 degrees abaft the beam of the ship as measured from the bridge (about 100 degrees to the right of the vessel's head) (Tr. 797:14–23; Ex. 662 at 58:5–19; Tr. 782:4–14); and

D. The midships's draft marks (located about 405 aft of the bow were about 800 feet from the end of the Coastal main dock. (Ex. 704 at 16:7–17). Position No. 2 as plotted on Trial Exhibit 671 is an accurate plot of the resulting fix.

66. The Nautilus's theory of the grounding is inconsistent with and unsupported by the grounded position of the vessel. (Tr. 1429:19–1430:16; *compare* Exs. 92, 97 and 671).

67. The Nautilus' theory of the grounding is inconsistent with the damages sustained by the BT Nautilus. (Tr. 1386:12–1387:24; Tr. 2030:21–2032:16).

68. The Nautilus' theory of the grounding is inconsistent with the physical evidence found on the bottom of the Kill van Kull. (Tr. 588:6–589:19; Tr. 826:5–827:20; Tr. 1407:4–24; *see also* Findings 43 through 55).

69. The Nautilus theory of the grounding is inconsistent with the beginning of the post-grounding rotation. (Tr. 1430:12–16; Tr. 494:6–15; Tr. 698:7–13; Tr. 761:2–17; Tr. 762:8–18; Tr. 768:8–12; Tr. 780:18–781:2; Tr. 783:3–7; Tr. 787:18–20; Ex. 662 at 63:16–23, 64:18–22, 67:15–18; Ex. 663 at 84:9–13).

70. The grounding of the BT Nautilus on the morning of June 7, 1990, outside both the federal channel and the Coastal New York ship berth in a shallow area shown on the navigation chart in use and known to the vessel's docking pilot was the direct consequence of negligent navigation of the vessel.

### THE COASTAL DREDGING

71. Coastal exceeded the scope of its dredging permit in connection with the 1980/1982 dredging project by dredging outside of the barge berth approach to the east and by dredging in the Coastal barge berth itself. (Tr. 84:12–86:22; Tr. 113:18–114:9; *see also* Tr. 87:25–89:4; Tr. 107:8–108:2.

72. In November of 1989, the Department of the Army issued a permit to Coastal authorizing it to dredge the barge berth to a depth of 26 feet plus 2. (Tr. 158:1–22).

73. In 1990, Coastal exceeded the scope of its permit by dredging its barge berth to 30 feet plus 2 instead of the authorized 26 feet plus 2. (Tr. 126:12–19).

74. Permit No. 15545 limited Coastal New York to dispose of not more than 20,000 cubic yards of dredged material at the Mud Dump Site. (Final Pretrial Order Stipulation No. 75).

75. Weeks Marine was selected to do the dredging work on the 1980/1990 dredging project and between January and April 1990, Weeks actually dredged a total of at least 41,907 cubic yards, for which Coastal paid. (Final Pretrial Order Stipulation No. 74, 76).

76. A comparison of the before dredging, (Ex. 654), and the after-dredging surveys done by Hydrographic Surveys indicates that the shallow ledge protruding into the ship berth basin became more intrusive during

the illegal dredging and this decreased the depth of water at that location. (Tr. 1475:14–1478:3; Ex. 654; Ex. 655).

77. Mr. Frederick F. Goebel, Coastal's Senior Vice President, Operations and Engineering compared the pre-dredging survey, (Ex. 241), with the post-dredging survey, (Ex. 243). He noted that where a depth of 39 feet had been recorded on the pre-dredging survey, the post-dredging survey recorded a depth of 34.5 feet at the same location, thus indicating that the ship berth had become shallower during the dredging operation. (Tr. 228:13–231:7).

78. Approximately five weeks later, four days after the grounding, an Army Corps of Engineers hydrographic survey reflected that further shoaling had taken place in the Coastal ship berth. (Tr. 1294:11–1295:4; Ex. 243; Ex. 85; Ex. 581).

79. As of June 11, 1990, the shoaling extended into the Coastal New York ship berth along the U.S. Channel Line and created a ledge at a 31–foot to 35–foot depth over a distance of approximately 125 feet into the ship berth basin unbeknownst to the general public, including mariners. (Ex. 85; Ex. 85A; Ex. 581).

80. Hydrographic Surveys Drawing No. 566 evidences high spots in the southeast corner of the Coastal ship berth. (Final Pretrial Order Stipulation No. 82).

81. The U.S. Environmental Protection Agency claimed that Coastal New York over-dredged beyond the limit authorized by the U.S. Army Corps of Engineers dredging permit, (Ex. 648), and subsequently Coastal and the Environmental Protection Agency entered into a Consent Agreement pursuant to which Coastal New York paid an agreed civil penalty. (Ex. 648; Tr. 294:2–24).

82. Nautilus's expert Herman Bomze, a licensed professional engineer, testified that the unauthorized dredging in the barge berth entrance, in 1990, caused the shoaling in the ship berth. Bomze was of the opinion that by dredging the barge berth to a depth of 30 feet (four feet more than intended) and the ship berth to a depth of 38 feet, a slope of eight feet was created. (Tr. 1296:3–1297:9; Tr. 1303:18–1304:10; Tr. 1307:1–13).

83. Nautilus's expert Ernst Frankel, a marine engineer and naval architect, also was of the opinion that the dredging in the barge berth so destabilized the basin that with the tidal currents, less stable material flowed into the deeper ship berth. (Tr. 1460:2–22). But it was not his opinion that any dredged material itself had been illegally dumped in the ship channel. (Tr. 1460:18–1461:6)

84. The court does not find whether there is or is not sufficient evidence exists of a relationship between shoaling in the southeast corner of the ship berth and the violation of the dredging permit for the barge berth because the accident happened well to the east of the Coastal ship berth. Since there is no nexus between what did or did not happen in the ship berth and the accident, the shoaling and its cause are irrelevant.

## NAVIGATIONAL AIDS

85. It was the opinion of Nautilus expert Mr. Bomze that there should have been a buoy or a navigational aid to mark the "toe of the slope", the demarcation between the 28 foot water depth in the barge slope and the 30–foot water depth of the ship berth. (Tr. 1307:18–1308:21). But like his testimony that the terminal was basically unsafe for the docking of ships like the BT Nautilus, (Tr. 1271:19), the opinion is premised on the assumption that the accident occurred in the ship basin. There is no factual nexus between his opinion and the occurrence of the accident outside the ship berth and the federal channel.

86. There are no navigational aids at the Coastal terminal as recorded on the navigation charts. It was the opinion of Nautilus expert Dr. Ernst Frankel that the absence of such navigational aids made it "extremely difficult to identify the extremities of the dredged basin," (Tr. 1478:18–22), "the identification of the exact location of the flare lines." (Tr. 1479:21–25; Tr. 1480:11–14).

87. Coastal makes the following responses. Knowledge of the exact position of the flare lines at the Coastal ship berth is not necessary for safe navigation. Knowledge of the existence of a generally shallow area

shown on the navigation chart requires that such area be given a wide clearance. (Tr. 2380:13–24; Tr. 2382:11–16).

88. The IMTT Pier A which has an unmarked flare line at its western end, between deep and shallow water, was described by Captain Naughton, the docking pilot, as safe. (Tr. 811:11–812:8; Ex. 605).

89. That the landmarks in the vicinity of the Coastal ship berth appear ample for safe navigation to the berth is further evidenced by the fact that a sister ship of the BT Nautilus, docked at the berth in July 1990, apparently without protest or incident. (Tr. 2008:5–20; Tr. 2200).

90. The Court also notes that nowhere in the Coast Guard report is there any indication that a lack of navigational aids contributed to the failure of the docking pilot to keep the ship within the navigable limits of the federal channel.

91. If Dr. Frankel's opinion is read in context with all of his testimony and Nautilus's theory of the grounding, it becomes evident that he is not saying that the inadequacy of the navigational aids contributed to the grounding outside the channel and the Coastal berth previously identified in these findings. Rather he is in effect saying that the navigational aids were inadequate for safe navigation to the berth because they didn't identify the exact location of the flare lines.

92. There is no factual connection between the lack of such navigational aids and the place of the accident: the BT Nautilus grounded outside the federal channel and in a shallow area identified on navigational charts.

93. Moreover the docking pilot "was not familiar with the shape or the dimensions of the dredged underwater basin leading from the channel to the Terminal." (Coast Guard Report, Ex. 672 at 1).

94. The Coast Guard report[3] concluded that "[t]he apparent cause of this grounding was failure on the part of the docking Pilot to maintain the BT Nautilus within the navigable limits of the channel as he brought the vessel into the Coastal Terminal" and that "[e]xcept as noted above there is no evidence of actionable misconduct, inattention to duty, negligence, or wilful violation of law or regulation on the part of licensed or certificated personnel; nor evidence of failure of inspected equipment or material; nor evidence that any personnel of the Coast Guard, or any other federal agency, or any other person contributed to this casualty. Therefore, it is recommended that this casualty investigation be closed." (Ex. 672 at 1, 5).

95. There is no factual nexus between the construction of the Coastal terminal and any inadequacy of navigational aids at the terminal and the grounding outside the ship berth and the federal channel.

### DISCUSSION AND CONCLUSIONS OF LAW

This is a case of Admiralty and Maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims; this Court has jurisdiction of this case pursuant to 28 U.S.C. § 1333(1).

**1.**

It is a well established principle that the plaintiff or libellant has the burden of proof to establish by a preponderance of the evidence the facts upon which the right to recover rests. *A.F.A. Tanker Corp. v. Reinauer Transp. Co.*, 594 F.Supp. 598, 604 (S.D.N.Y.1984). Here the burden of proof was upon the BT Nautilus ("Nautilus"), as the complaining party, to establish by a preponderance of the evidence that the Nautilus first contacted the bottom of the Kill van Kull within the limits of the Coastal New York ("Coastal") ship berth. This burden was not borne.

**2.**

■ The parties do not dispute the general principle of law that the Nautilus as the

---

**3.** Over objection of Nautilus the court determined in a separate written opinion that the Coast Guard report in its entirety was admissible, finding that the conclusions and opinions contained in the report met the criteria for trustworthiness as set forth in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988).

Limitation Plaintiff has the burden of proving Coastal's liability by a preponderance of the evidence. But Nautilus, invoking *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), argues that because of certain statutory violations the burden of proof has shifted to Coastal to establish that such violations not only did not, but could not, have contributed to the grounding of the Nautilus on June 7, 1990. *The Pennsylvania* rule, in addition to shifting the burden of proof, would require a clear and convincing showing that the violation could not have been a proximate cause of the collision. *Cliffs–Neddrill Turnkey v. M/T Rich Duke*, 947 F.2d 83, 86 (3d Cir.1991).[4]

Named for the case in which it was laid down, *The Pennsylvania* rule states that when, at the time of a collision a ship

is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it *could not have been.*

86 U.S. at 136 (emphasis added). The rule allocates the burden of proof, transferring it to the party in violation of a statute or regulation. If a party is to escape liability for the loss, it must prove not just that its violation probably was not, but in fact could not have been a cause of the colli-

sion. *See Candies Towing Co., Inc. v. M/V B & C Eserman*, 673 F.2d 91, 93 (5th Cir.1982) (the rule of *The Pennsylvania* "constitutes an evidentiary rule reversing the burden of proof"); Grant Gilmore & Charles L. Black, *The Law of Admiralty* § 7–5 (2d Ed.1975). *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1471–72 (5th Cir.1991); *see also Cliffs–Neddrill Turnkey*, 947 F.2d at 86.

Application of *The Pennsylvania* rule is not limited to collisions between ships but has "been reformulated to apply to 'any statutory violator' who is a 'party to a maritime accident.'" *Pennzoil Producing Co.*, 943 F.2d at 1472 (citations omitted).

Nautilus also contends that Coastal's failure to remove the obstructions in its ship berth violated Special Condition B of the dredging permit issued to Coastal by the Army Corps of Engineers and also constituted a statutory violation. So Nautilus argues that the burden of proof shifted to Coastal to prove that the statutory violation could not have been a cause of the grounding in the ship berth, and that Coastal has not met that burden.

Coastal does not dispute that in 1990, prior to the grounding, it engaged in unauthorized dredging, that its over-dredging exceeded the scope of the permit issued to Coastal by the U.S. Army Corps of Engineers, and that this dredging constituted a violation of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.[5]

---

**4.** "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" (Citations omitted.), *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 282, 110 S.Ct. 2841, 2853, 111 L.Ed.2d 224 (1990).

"The term preponderance" means that "upon all the evidence ... the facts asserted by the plaintiff are more probably true than false." *Porter v. American Export Lines, Inc.*, 387 F.2d 409, 411 (3d Cir.1968) (*quoting Burch v. Reading Co.*, 240 F.2d 574, 578–79 (3d Cir.1957), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957). On the other hand, the clear and convincing standard of proof has been defined as

"evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Jobes*, 108 N.J. 394, 407–408, 529 A.2d 434, 441; *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 285 n. 11, 110 S.Ct. 2841, 2855 n. 11, 111 L.Ed.2d 224 (1990).

**5.** 33 U.S.C. § 403. **Obstruction of navigable waters generally; wharves; piers; etc.; excavations and filling in**

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven,

Coastal responds by asserting that there is no evidence that the high spots in the ship berth caused the grounding, so the burden did not shift, and even if it did shift it has shown by clear and convincing evidence that the over-dredging did not and could not have been a proximate or contributing cause of the grounding.

*The Pennsylvania* rule does not apply in the circumstances of this case: Nautilus has not demonstrated that the accident occurred in the ship berth. *The Pennsylvania* rule was not meant to be "a hard and fast rule" that requires a finding of fault for statutory violations "no matter how speculative, improbable or remote." *Cliffs–Neddrill Turnkey,* 947 F.2d at 88 (*quoting Board of Comm'rs v. M/V Farmsum,* 574 F.2d 289, 297 (5th Cir.1978)).

In *Gosnell v. United States,* 262 F.2d 559 (4th Cir.1958), the Court of Appeals affirmed the district court of Maryland's decision not to apply *The Pennsylvania* rule because the plaintiff failed to prove what physically caused the damage to the boat.[6] In *Gosnell,* the defendant had violated the Wreck Statute, 33 U.S.C. § 409 when it caused a barge to sink by towing it at too great a speed. That violation, however, did not place the burden on the barge owner to prove that the loss of the fishing vessel could not have been caused by debris from the barge. Quoting from the District Court's opinion the court stated:

"There are several reasons why this is not a sound argument. The Pennsylvania rule does not apply where the physical cause of the damage is not known. Any plaintiff, marine or shoreside, who seeks to hold a defendant liable for injuries, must show: (1) the physical cause of his injuries; (2) fault on the part of the person sought to be held responsible; and (3) a causal connection between such fault and the physical cause. The Pennsylvania rule begins to

operate after libelant has passed the second stage and not before. The Pennsylvania rule does not shift the burden of proof on the first issue; the physical cause of the damage. Such proof is always a part of libelant's case. The argument advanced by claimants disregards the distinction between (1) the physical cause, or cause in fact, of a casualty, and (3) the causal connection between respondent's fault and the physical cause."

*Gosnell,* 262 F.2d at 563–564.

Nautilus's proof failed to place the accident in the ship berth. The failure of that proof is not salvaged by resort to *The Pennsylvania* rule. Because the physical cause of the damage was the shoals outside the channel and the Coastal berth, the breach of the statutory duty in dredging beyond the scope of the permit could not be the physical cause of the damage to the ship.

*The Pennsylvania* rule is simply not applicable to the circumstances of this case, thus Coastal is not required to prove by clear and convincing evidence that its statutory violation could not have been a cause of the grounding in the ship berth. If the BT Nautilus had hit "high spots" or some obstruction in the ship berth, then Coastal would have the burden of proving that its statutory violation could not have caused the "high spots" or the obstruction. But the BT Nautilus did not ground in the ship berth. It grounded in an area well to the east, outside the federal channel and outside the ship berth. Nautilus has never contended that this area was impacted by the dredging in the Coastal barge berth.

The situation is no different than if a swimmer were injured in a collision with a boat that violated a navigational rule requiring a look out, as in the case of *Schumacher v. Cooper,* 850 F.Supp. 438 (D.S.C.1994). The

harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the · Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal,

lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army Prior to the beginning the same.

6. *See The YFNX–6,* 156 F.Supp. 325 (D.Md. 1957), *aff'd, Gosnell,* 262 F.2d at 559.

statutory violation would shift the burden of proof under *The Pennsylvania* rule and require the defendant, the violating party, to prove that the violation did not contribute to the injury.

But *The Pennsylvania* rule would not relieve the swimmer of proving in the first instance that he was, in fact, struck by the boat. In other words, a statutory violation does not relieve the plaintiff of proving that the boat struck him. If he cannot prove he was struck by the boat in question, *The Pennsylvania* rule does not shift the burden to require the defendant to prove that the boat could not have struck the swimmer.

That is the situation here. There is no nexus between the statutory violation and the accident. Nautilus has not proved by a preponderance of the credible evidence that the vessel was damaged by a collision with objects in the Coastal ship berth. It has not proved where the accident happened. Absent such proof *The Pennsylvania* rule does not apply.

**3.**

■ A presumption of negligence is created when a vessel strikes a charted obstruction. *McAllister Bros., Inc. v. United States,* 709 F.Supp. 1237, 1251 (S.D.N.Y.1989) (court explained that striking a charted reef raises a presumption of negligence), *citing Afran Transport Co. v. United States,* 309 F.Supp. 650, 655 (S.D.N.Y.1969), *aff'd,* 435 F.2d 213 (2d Cir.1970), *cert. denied,* 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971). Nautilus has failed to rebut this presumption of negligence by a preponderance of the credible evidence.

**4.**

■ The master of a vessel is "under a continuing duty to know where his vessel is at all times, and he, or those under him, are (or should be) in possession of all other pertinent facts relating to the voyage." *Mid–America Transp. Co., Inc. v. Nat'l Marine. Serv., Inc.,* 497 F.2d 776, 780 (8th Cir.1974) *cert. denied,* 425 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976); *See also Pennzoil Producing Co.,* 943 F.2d at 1471 n. 5 (5th Cir.

1991). The grounding of the BT Nautilus outside the federal channel in a shallow area depicted on the navigational charts without any exculpatory explanation constitutes a breach of this duty.

■ Both the docking pilot and the captain bear the responsibility for bringing the boat safely through the channel to the Coastal berth. The Captain as master has the authority to countermand any of the pilot's orders which places the vessel in a position outside the channel. *See Delta Transload, Inc. v. M/V Navios Commander,* 818 F.2d 445, 451 n. 17 (5th Cir.1987).

**5.**

"[U]pon proof of grounding it is the duty of the [vessel] to come forward to establish that she was in the channel and did not hit *a known obstruction therein or to furnish other exculpatory explanation* (e.g. act of God) for the grounding." *Mid–America Transp.,* 497 F.2d at 780 (emphasis added). "[T]he vessel is charged with the duty of producing evidence that her fault did not cause the grounding." *Id.* at 780. The master and pilot had a better opportunity of ascertaining where the ship grounded by use of the Nautilus's fathometer and course recorder.

**6.**

■ "[K]nowledge of an otherwise nonvisible object warrants imposition of presumed negligence against those operating the vessel who possessed this knowledge." *Delta Transload, Inc.,* 818 F.2d at 450. The pilot, Captain Naughton, knew or should have known of the existence of a well-known and fully-chartered shallow area. This presumption of negligence has not been rebutted by a preponderance of the credible evidence.

**7.**

In addition, Captain Ainscough allegedly recorded the ranges and bearings of fixed objects from his vessel while the ship was still aground, and allegedly erased such ranges and bearings from the navigation chart in use on the bridge. Captain Ainscough claims to have lost the piece of paper on which he recorded the Nautilus's position

and claims that the navigational charts were erased pursuant to admiralty custom.

Although no statutory provision required the BT Nautilus to be equipped with a course recorder, it did have one. By not turning it on prior to the ship's getting under way on the morning of June 7, no course recorder tapes were available to assist in reconstructing the accident.

■ Under admiralty law, the suppression, erasure, or alteration of a ship's records permits the court to draw an adverse inference. *See, e.g., The Silver Palm—The Chicago,* 94 F.2d 754, 762 (9th Cir.1937) (wrongdoing is inferable when a party is found to have fabricated or suppressed documents); *Glasgow Maru,* 102 F.2d 450, 453 (2d Cir. 1939) (under admiralty law the alteration, erasure, or substitution of logbooks creates a presumption that the erased or altered materials were adverse to the charged party).

■ Whether or not the erasure and the loss of the piece of paper created a presumption of wrongdoing under admiralty law, it was nevertheless important information in Nautilus's possession. Similarly, the information the course recorder could have provided—had it been on—would have assisted in the determination of the point of impact. The inability of Nautilus to satisfactorily explain the absence of this information permits the court to draw an adverse inference against Nautilus.

### 8.

The burden was on Nautilus to prove that the grounding out of the channel, in a chartered area, was not its fault. "[T]he law takes into account the relative opportunity of the parties to know the fact in issue and to account for the loss which it is alleged is due to the breach." *Mid–America Transp.,* 497 F.2d at 789.

Nautilus had the duty of coming forward with information that it had or could have had. "[T]he Captain or those under him, are (or should be) in possession of all other pertinent facts relating to the voyage." *Mid–America Transp.,* 497 F.2d at 780. As Judge Learned Hand stated: "It is often a controlling factor in deciding where to throw the burden of producing evidence—and obviously it ought to be—that the proper party to charge is he who alone could discover the truth." *Sternberg Dredging Co. v. Moran Towing & Transp. Co.,* 196 F.2d 1002, 1006 (2nd Cir.1952).

The absence of the Nautilus's range and bearing information as well the course recorder tapes, permits the court to infer that the grounding was the fault of those operating the ship and not the fault of Coastal.

The validity of this inference has not been impugned by evidence that Nautilus produced in support of its position that the grounding took place in the Coastal berth. *See, e.g., Mid–America Transp.,* 497 F.2d at 780.

### 9.

■ Nautilus also attempted to fault Coastal for an unsafe approach and berth. It is well settled that a terminal operator such as Coastal does not guarantee the safety of vessels coming to its docks. *Sonat Marine Inc. v. Belcher Oil Co.,* 629 F.Supp. 1319, 1326 (D.N.J.1985), *aff'd* 787 F.2d 583 (3d Cir.1986). The wharfinger has a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. The wharfinger also has a duty "to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger, in the exercise of reasonable care and inspection, should be known to the shipowner." *Trade Banner Line, Inc. v. Caribbean Steamship Co.,* 521 F.2d 229, 230 (5th Cir.1975), *citing Smith v. Burnett,* 173 U.S. 430, 433, 19 S.Ct. 442, 443, 43 L.Ed. 756 (1899).

■ Although Coastal, as a terminal operator had a duty to exercise reasonable diligence to provide a safe berth, "there is no duty on the part of the wharfinger to provide a berth with safe surroundings (other than an entrance and exit) or to warn that hazards exist in its vicinity...." *Trade Banner Line,* 521 F.2d at 230. The duty to provide a safe berth and approach does not create a duty to make safe "adjacent areas." *Sonat Marine,* 629 F.Supp. at 1237. Here the Nautilus ran aground in an area outside the ship

berth, a surrounding area for which Coastal was not responsible.

The plaintiff cannot simply allege causal connection between the construction of the terminal or independent navigational aides and the grounding at the "point of impact" outside the ship berth. Nautilus has vigorously denied that is where the accident took place. It is not enough to simply allege a causal connection. Nautilus must point to facts upon which such a connection could be found. Nautilus has not done this.

Assuming, arguendo, that Coastal was negligent in the design and maintenance of its terminal in failing to consult with experts before expanding its terminal to accept larger vessels; placing an eight foot slope in a dangerous position; and in failing to provide adequate navigational aids or information that would assist mariners in locating the precise limits of its ship berth, Nautilus as Limitation Plaintiff, has failed to prove by a preponderance of the credible evidence that Coastal's conduct was a proximate cause of its injury. *See Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907, 922 (S.D.N.Y.1977), *aff'd in part, rev'd in part,* 584 F.2d 1151, 1161 (1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979) (negligence, if any, of Coast Guard in not establishing more effective aids to navigation not a proximate cause of grounding of tug and barge which struck charted rock outside navigable channel in Hudson River); W. Page Keeton et al., Prosser and Keeton on The Law Of Torts § 42 (5th ed. 1984); *Restatement (Second) Torts,* § 441 (1965).

**10.**

Any negligence of the docking pilot controlling the movements of the BT Nautilus on the morning of June 7, 1990 is attributable solely to the ship and to Nautilus. *Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique,* 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901); Gilmore & Black, *The Law of Admiralty,* 520–21 (2nd ed. 1975).

Of course, if Coastal were in any way negligent, any negligence of the docking pilot would not, under the comparative negligence rule, affect the liability of Coastal for its negligence. *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

The court has not been asked to apportion liability between anyone but Coastal and Nautilus. The parties have not addressed the legal consequences to a shipowner resulting from the negligence of a compulsory pilot as distinguished from a discretionary one. See e.g. *Evans v. United Arab Shipping Co., S.A.G.,* 4 F.3d 207, 217–219 (3d Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994); *Delta Transload,* 818 F.2d at 451 n. 17.

Consequently, these conclusions of law are intended to apply only to the liability of Coastal for the grounding, and not to any apportionment of liability between the pilot and the captain. "Generally, shipowners are not liable for torts committed through the negligence of a compulsory pilot under the theory that the owner had no discretion to select the individual." *Evans,* 4 F.3d at 217. "The vessel, however, may be held liable *in rem.*" *Evans,* 4 F.3d at 217 (*citing, The China,* 74 U.S. (7 Wall) 53, 19 L.Ed. 67 (1868)).

**11.**

The conduct of those operating the BT Nautilus on the morning of June 7, 1994 was the sole cause of the grounding.

## CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, judgment shall be entered on behalf of Limitation Defendant Coastal.

Counsel for Coastal shall prepare a judgment in conformity with this opinion and forward a copy to counsel for Nautilus, for approval as to form.