**SONAT MARINE INC. and Gellenthin Bulk Transport Corp. and Intercities Navigation Corp., Plaintiffs,**

v.

**BELCHER OIL COMPANY, Defendant.**

Civ. A. No. 83–2563.

United States District Court,
D. New Jersey.

July 3, 1985.

---

Clark, Ladner, Fortenbaugh & Young by E. Michael Keating, III, Haddonfield, N.J., for plaintiffs.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy by Donald B. Allen, New York City, for defendant.

## OPINION

DEBEVOISE, District Judge.

This is an admiralty proceeding brought under 28 U.S.C. Section 1333 in which damages are sought for the grounding of the barge Interstate 138 during its approach to the Belcher Marine Terminal in the early morning hours of August 8, 1982.

The barge Interstate 138 was owned by plaintiff Intercities Navigation Corporation and operated by plaintiff Sonat Marine Inc. The barge was under the control of the tug Diplomat, owned by plaintiff Gellenthin Bulk Transport Corporation and operated by Sonat Marine Inc. An assist tug, the Patriot, operated by Sonat Marine Inc., was also aiding the navigation of the Interstate 138. It was stipulated that the damages incurred as a result of the grounding were $535,000 exclusive of prejudgment interest. All of these damages were incurred by Sonat.

The Marine terminal above the water line was and is owned by defendant Belcher Oil Company of New York. Belcher is a lessee of the underwater part of the terminal. It neither leases nor owns the area between the leased portion of the terminal and the government channel over which vessels pass to reach the terminal.

A trial has been held and this constitutes my findings of fact and conclusions of law.

### Findings of Fact

The Belcher terminal is located on the north side of the Kill Van Kull waterway. The terminal consists of two main piers, a ship pier and a barge pier. I shall attach to the transcribed copy of this opinion copies of deposition Exhibit D–13, an aerial photo of the terminal and of deposition Exhibit D–11, a portion of the NOAA chart showing the terminal. Reference can be made

to these exhibits when one reads the description of the piers which follows.

The ship pier runs almost perpendicular to the government maintained channel on roughly a north/south axis. The channel end of the ship pier, the southern end, is some 15 feet inshore of the United States pier line. Three mooring cells or dolphins, are located at the channel end of the ship pier. One is located almost immediately to the west of the pier end. Another is located roughly 100 feet to the east of the end of the ship pier. A third, slightly smaller dolphin, is located approximately 100 yards to the east of the ship pier head. These three dolphins run nearly parallel to the channel and together with the end of the pier form the ship berth. Docking space for small barges and vessels is available along the eastern side of the ship pier inshore of the line of the dolphins.

The barge pier consists of a wood and steel catwalk together with a pipe rack which extends first, perpendicular and to the east of the ship pier for a distance of roughly 200 feet and then turns approximately 50 degrees towards the south in the general direction of the main shipping channel. Along the face of and parallel to the barge dock are four breasting dolphins, two of which are located immediately in front of the barge berth face and two of which are located beyond the end of the barge dock catwalk, but generally in line with the first of the two dolphins.

The barge dock was constructed in 1976 by Howard Oil Company ("Howard"), the previous owner of the terminal. The barge dock has been constructed pursuant to a permit issued to Howard by the Corps of Engineers, which permitted the construction of the pier and the dredging of an irregularly shaped area located between the new pier and the pre-existing ship berth. This dredging allowed barges being brought in by Howard to reach the barge dock from the main channel.

Belcher purchased the marine terminal from Howard in 1978. Shortly after purchasing the terminal, Belcher decided to make substantial improvements to the facility. These improvements included both dredging and structural improvements in the ship berth and dredging in and around the barge berth and its approach. Belcher filed an application for a Corps of Engineers' permit on January 8, 1980. This permit application which was ultimately granted on December 30, 1981, covered only the proposed improvements to the ship berth. Belcher did not seek or obtain a permit for the work contemplated on the barge berth. Work was performed during the winter of 1981/82, and was completed in February 1982.

Belcher's terminal is shown on NOAA chart 12333 which generally covers the Kill Van Kull and the northern part of the Arthur Kill. It shows a reported depth of 26 feet at mean low tide from the government maintained channel of the Arthur Kill into the barge dock area of the terminal. On the chart the eastern boundary of the 26 foot area is a line running through the four dolphins at the barge dock and extending out to the edge of the main channel. On the chart the western boundary of the 26 foot area is a line roughly parallel to the eastern boundary running through the most easterly of the ship-dock dolphins and extending out to the edge of the channel. To the east of the 26 foot reported depth area the depth is reported on the chart to be 22 feet or less. Witnesses for Sonat stated that the water around the rock which Interstate 138 grounded is shown by countour lines which have a 30 foot depth, but I must confess that I have trouble discerning this from my examination of the chart. Quite obviously a vessel with a draft of 22 feet or more entering the barge berth would seek to use the reported 26 foot area and would seek to avoid passing over waters to the east.

In 1982 Belcher retained Weeks Dredging and Construction Company to conduct dredging operations. Belcher had obtained from the Corps of Engineers a permit to dredge a large area to the south of the ship pier to a 38 foot depth. This area was shown on Defendant's Exhibit 12. In addition, in the language of its Vice President

for Operations and Engineering, Belcher "stretched the permit" and had Weeks perform dredging which had the effect of widening to the east the 26 foot area from the barge dock to the government channel. This required dredging from the terminal berth area and in places south of the most southerly barge dock dolphin. Weeks made soundings from the channel to the barge dock and where the depth was already 26 feet or more, it was unnecessary to perform actual dredging operations. I shall attach to the transcript of this opinion a copy of Exhibit P–33A. This sketch shows the approximate Weeks dredge line. The area between the dredge line and the line drawn through the four dolphins to the channel would be the approximate additional area in which Belcher sought to maintain a 26 foot depth. It should be noted that the rocks shown on P–33A are not the rock which caused the difficulty in the present case. They are rocks located during the search for the pertinent obstruction and are at a depth which is greater than 26 feet at mean low water.

Belcher's reason for widening the approach was that it recognized that larger vessels had problems entering the barge berth and required a greater margin of safety.

To accomplish this Belcher asked Weeks to perform a survey to the east of the barge dock as dredged by Howard. Belcher also requested that Weeks dredge, as necessary, to provide 26 feet of water (at mean low water), in a triangular area measuring roughly 200 feet to the east along the face of the government channel and 400 feet along the eastern edge of the area dredged in 1976 by Howard. This had the effect of widening the approach from the government maintained channel from a width of approximately 350 feet at the edge of the government channel to a width of approximately 550 feet.

Belcher did not inform its customers or government agencies of the widening of the approach to its terminal. Thus after February 1982 it was aware that the 26 foot depth area had been extended well beyond that shown on chart 12333. Pilots and ship operators would still rely on the chart showing the narrower as reported 26 foot area.

In March 1980, well before the 1982 dredging operations, Barge B95, while being pushed by tug Morton S. Bouchard, grounded while approaching the dock off Belcher terminal. On March 13, 1982, shortly after completion of the Weeks dredging, Exxon Albany, a barge having a 125,000 barrel capacity and drawing at the time 25.5 feet of water, grounded while approaching the Belcher terminal. It grounded in the same location where Interstate 138 grounded and based on information developed in this case, it is reasonable to conclude that it struck the same rock on which Interstate 138 grounded. After an investigation the Coast Guard reported that "The apparent cause of the casualty was the striking of an unchartered, submerged object outside of the navigable channel." A copy of the report dated June 22, 1982 was sent to Belcher.

On August 8, 1982 the barge Interstate 138 took on a part load of fuel oil at the Stapleton Anchorage in New York Harbor which was to be delivered to the Belcher terminal. The Interstate 138 is a steel-hulled tank barge, 391.4 feet in length with a beam of 68 feet and a depth (distance from deck to keel) of 39.25 feet. On the morning in question it had a draft of 24 feet forward and 24 feet six inches aft. The capacity of Interstate 138 was 133,219 barrels of oil.

On the morning in question the weather was clear, visibility was good and there were inconsequential winds. There was an ebb tide flowing easterly at one knot or less. The barge had no motor power of its own and was pushed by the tug Diplomat, whose bow was fitted into a notch in the stern of the barge. The tug and barge proceeded through the Kill in a westerly direction and were met east of the Belcher terminal by the Patriot, a tug assigned by Sonat to assist in berthing the barge. Mahlon Price, the mate of the Diplomat, was controlling the maneuvers of his tug

and tow and was also in charge of the operations of the Patriot. He positioned the Patriot on Interstate 138 forward port side. The tug Diplomat is 195 gross tons, 126 feet long, draws 17 feet of water and has a beam of 34 feet. The Diplomat is a twin screw tug with 4,000 horsepower. The tug Patriot is 194 gross tons, 118.5 feet long, draws 18 feet of water and has a beam of 34 feet. She is equipped with twin screws, twin flanking rudders and 3,000 horsepower.

Arrangements had been made to bring the barge into Belcher's barge dock at approximately 4 a.m. on August 8. Prior to arriving at the Belcher terminal Sonat's dispatch office placed a call to Belcher terminal and inquired about the available depth of water at the berth. Sonat was informed that there was 26 feet of water at the berth.

The flotilla consisting of the barge and the two tugs approached Belcher's terminal at about 4 a.m. It was still dark. As the bow of the barge passed the line of dolphins which formed the face of the barge berth, Price, who was at the Diplomat, began to let the flotilla turn in gradually towards the barge dock. Just as he commenced this maneuver and before he had given any engine orders to the assist tug, the flotilla stopped all forward motion. Subsequent attempts to maneuver the flotilla showed it was hard aground with a pivot point located near the midsection of the barge approximately 100 feet from the stern. Deep water otherwise surrounded the flotilla. After attempts to free the flotilla failed, the flotilla waited for the change in tide and the high water to free the barge. The grounding caused the damage which has been stipulated.

Subsequently Sonat retained a commercial diving company, Waterfront Corporation, to seek to locate, photograph and measure any rock or obstructions in the entrance of the barge berth at the Belcher terminal. Waterfront, using a side scan device, located one large rock which would have been an obstruction to navigation at mean low water for a barge drawing 24 feet 6 inches. The rock was ten feet long, seven feet six inches wide and five feet high at its highest point above river bottom. The top of the rock was 23 feet below mean low water. Orange paint on the top of the rock confirmed that it was the obstruction on which Interstate 138 had grounded.

The rock was located approximately 64 feet to the north of the government maintained channel. It was approximately 55 feet west of the line to which Weeks had conducted soundings and, where necessary, dredged to a 26 foot level. It was approximately 88 feet east of the easterly line of the 26 foot reported depth area shown on chart 12333. Thus the rock was outside of the area which the chart 12333 showed as having a 26 foot reported depth. It was well within the additional area which Belcher had cleared for a minimum 26 foot depth in January and February of 1982. It was somewhat nearer the main channel than the rocks shown on attached Exhibit P–33A. Its precise location is shown on Exhibit 12A which is not attached.

Mahlon Price, mate of the tug Diplomat, was aware of the depth shown on chart 12333, and he sought to guide the flotilla into the 26 foot reported depth area and to avoid the waters to the east of that area. Had he succeeded Interstate 138 would not have grounded. On the other hand, had Belcher succeeded in its 1982 effort to ensure 26 foot minimum depth in the expanded area where soundings were made and which was dredged by Weeks, Interstate 138 would have passed safely over the spot where she grounded and would have entered the barge area undamaged.

Each side in this case asserts that the grounding was caused by the sole fault of the other. I conclude each side was at fault and that the fault of each contributed to the happening of the grounding.

A. *The Negligence of Mahlon Price:* Each side produced an expert witness to give an opinion about Price's negligence. Captain Richard Hugh Riley testified for Belcher and Kalus Matthes testified for Sonat.

According to Matthes, and as an examination of the chart and photographs of the terminal will show, the terminal offered a very limited avenue of entry for a barge the size of Interstate 138. There are no buoys marking the entrance from the Kill. The easternmost dolphin of the ship dock and the angle and location of the barge berth require an angled approach. Interstate 138 arrived while it was still dark. There were no range lights marking the barge berth channel, there were no lights on the barge dock dolphins, the lights on the barge dock itself were not bright or adequate to substitute satisfactorily for range lights, although they were, of course, useful in determining position.

Matthes was of the opinion that Price had positioned himself and the persons aboard the barge and the two tugs so as to have adequate observations during the entrance to the terminal. In his view the angled approach which Price took was the best under the circumstances. Even though Price took the barge into the area east of the reported 26 foot area as shown on the chart, this was proper according to Matthes because the dots on the chart showed that in the area where he went there was 30 feet of water; not the 22 feet shown further east. Matthes was of the opinion that an approach recommended by Captain Riley that commenced further out in the Kill and brought the flotilla in at an angle more perpendicular to the Kill would have been unwise because the tide would have caught the barge.

Captain Riley faulted Price's maneuvers in a number of respects. Basically he believes that Price came in at the wrong angle, that he should have been further out in the Kill and then come in straight on the barge dock. To accomplish this the tug Patriot should have been on the starboard side of Interstate 138 to counteract the tide and prevent it from being carried east over the shoal area shown on chart 12333. Further, Captain Riley concluded that Price positioned himself and other crew members in places where they could not adequately check the dolphins and the shore lights, so as to ensure that Interstate 138 remained in the 26 foot area. In all events, Captain Riley would have kept well clear of the area east of the reported 26 foot depth area as shown on the chart.

Price was unaware of the surveying and dredging operations which Belcher had completed in 1982. So far as he knew, chart 12333 disclosed the conditions as they existed at Belcher terminal and in its approaches. That chart showed 26 feet of water in a definite area and highly questionable water to the east where a vessel drawing 24 feet six inches would be likely to ground. Chart 12333 should have been buttressed in Price's mind by the warnings contained in U.S. Coast Pilot No. 2 which states in part that "Shoals, obstructions and numerous wrecks are along both sides of the dredged channel in Kill Van Kull." Price was fully aware of these conditions as a result of his many years of experience in these waters.

Entrance to the Belcher terminal under the conditions shown in chart number 12333 by a barge of the dimensions of Interstate 138 was extremely difficult. But those conditions required that the person bringing a barge that size into the terminal do whatever was necessary to ensure that he remained in the reported 26 foot area shown on the chart.

▮ I conclude that the means were available to do that in the early morning of August 8, 1982. I can't fault any individual measure that Price took or failed to take, but the totality of those measures failed to keep Interstate 138 in the area which the chart showed to be safe. Even Sonat's expert Matthes conceded that it should be possible to keep a barge in that area if one were very careful. Under the circumstances one should be sufficiently careful to achieve that result, or else one should wait until daylight or not attempt the entrance at all. To do otherwise, as Price did, is at least some degree of negligence.

B. *The Negligence of Belcher:* Belcher's negligence was continuing and somewhat more egregious than that of Price.

It is quite apparent that if the waters off the Belcher terminal were as shown on chart 12333, a barge the size of Interstate 138 drawing 24 feet six inches could not safely enter the barge berth. The approach was very narrow. The area shown to have a reported depth of 26 feet was limited. There were no range lights to enable a barge making a nighttime entrance to keep in the center of the narrow approach. The lights on the barge dock were a totally inadequate substitute for range lights. There was no buoy at the entrance from the government channel in the Kill.

Belcher's Terminal Manual, required by Coast Guard regulations had, as of August 8, 1982, last been revised on October 2, 1981—before the Weeks sounding and dredging. It provided that "The barge berth on the west side of Pier No. 2 can accommodate one barge or power boat up to the 125,000 barrel class. This berth is limited by 24 feet of water at mean low water." Compliance with this limitation would require that barges of the size of Interstate 138 which had a capacity of 133,-219 barrels and drew 24 feet six inches at the time of the grounding not be permitted to berth at the terminal.

Belcher recognized that larger barges had serious problems entering the barge berth under the conditions which prevailed prior to 1982 and as shown on chart 12333. For this reason it asked Weeks to bring the depth to 26 feet and to expand outward to the east the area which had an assured depth of at least 26 feet. As Belcher's Frederick Goebel explained it, Belcher wanted to give itself comfort and avoid spills and groundings. Belcher wanted to add additional room so that if a vessel erred in approaching from the channel it would be safe. Thus Belcher recognized the very great likelihood that a barge such as Interstate 138 would err if it attempted to enter the terminal's barge berth and Belcher sought to avoid the consequences of such errors.

To do this Belcher took measures which extended from the dock through the sub-merged area which it leased and from there to the northern line of the government maintained channel.

It obtained from Weeks soundings, and then it arranged for Weeks to dredge to a depth of 26 feet the area to the east of the easterly boundary of the reported 26 foot area shown on chart 12333. There can be no doubt that Belcher then concluded that it had widened significantly the 26 foot area and that because of this new condition felt justified in accepting barges of larger sizes and drawing more water than specified in its Operation Manual.

■ Belcher's first act of negligence was failure to use means adequate to ensure that the new area where it thought larger barges could safely go was free of obstructions rising above 26 feet. Weeks' method of recording soundings did not cover every spot in that area. Rather, the equipment used (Raytheon fathometers) took soundings along parallel ranges perhaps recording the depths at all points along the ranges, but leaving gaps between the ranges where obstruction might remain undetected. The actual dredging took place only in a portion of the new 26 foot area and the soundings were relied upon in those portions of the new area which were shown to be already at the 26 foot depth. Those areas were not wire dragged nor was a side sweep used to detect hidden obstructions. Thus the rock on which Interstate 138 grounded remained undetected.

Nevertheless Belcher invited into its terminal barges which exceeded the capacity or draft limitations of its operations manual. It is reasonable to conclude that it felt justified in so doing because it believed that by widening the 26 foot area it had provided the extra margin of safety such vessels required.

■ In March 1982 the Exxon Albany grounded in the same place that Interstate 138 grounded in August of the same year. That was only a month after Belcher thought it had cleared and widened the approach to the barge berth to a depth of 26 feet or more. In June Belcher received

a copy of the Coast Guard report that Exxon Albany struck an unchartered submerged object outside of the navigable channel. Belcher was able to observe where the Exxon Albany was hung up, because it remained there for an appreciable period of time until lifted off by the tide. It must have realized that the barge was in the area which it believed had a 26 foot minimum depth. It had a television camera on its terminal roof which took periodic shots of vessels entering the terminal. It did not check these photographs to ascertain the position of the Exxon Albany when it was grounded. Belcher made no attempt to locate the obstruction and it continued to take barges which exceeded the limitations set forth in its operating manual. This was negligence.

On August 8 Belcher advised Sonat, upon Sonat's inquiry, that there was 26 feet of water available at the berth. This advice necessarily constituted advice that there was at least 26 feet of water in the approach to the berth. Belcher knew that the safe approach to the berth had to include the additional 26 foot area beyond that shown on the chart. It had failed to take adequate precautions in January and February to assure itself that there were no obstructions in that area or less than 26 feet. It received information in March and June of 1982 sufficient to put it on notice that there was such an obstruction in the additional 26 foot area. It had long realized that it was highly likely that barges the size of Interstate 138 would cross the additional 26 foot area when entering the terminal. Yet its answer to Sonat's inquiry on August 8 constituted an invitation to bring Interstate 138 drawing 24 feet six inches into the barge berth and could in no way be viewed as a warning to avoid a possible hazard just to the east of the reported 26 foot area shown on chart 12333.

The totality of the circumstances constitutes major and continuing negligence on Belcher's part.

■ *C. The Relevant Degree of Negligence:* Price's negligence was a momentary lapse from a degree of extreme care which the conditions shown on chart 12333

called for. It was the kind of lapse which in 1981 Belcher had concluded was likely to occur when large barges entered the tightly constricted, unmarked approach to its barge terminal. If Belcher had accomplished the improvements which it sought to accomplish in early 1982, Price's lapse would have been of no moment.

Belcher's fault, on the other hand, was a continuing one from the inception of its dredging project and acceptance of larger barges until it finally removed the offending rock and imposed new size and draft limitations after the grounding of the Interstate 138.

I conclude that a fair apportionment of responsibility for the grounding is 25 percent for Price's negligence and 75 percent for Belcher's negligence.

### Conclusions of Law

The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Section 1333.

The facts concerning Price's approach to the Belcher terminal are set forth above. With greater care he probably could have prevented the barge from passing through the waters east of the reported 26 foot depth area shown on chart 12333. His failure to do so was a failure to use ordinary care under the circumstances which contributed to the grounding of Interstate 138. *Bunge Corporation v. M/V Furness Bridge*, 558 F.2d 790 (5th Cir.1977).

■ A terminal operator such as Belcher does not guarantee the safety of vessels coming to its docks. However, "he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereafter and if there is any dangerous obstruction, to remove it, or to give due notice of its existence to vessels about to use the berths." *Smith v. Burnett*, 173 U.S. 430 at 433, 19 S.Ct. 442 at 443, 43 L.Ed. 756 (1899). This duty includes the duty to ascertain the existence of underwater obstacles, e.g., *Medomsley Steamship Company v. Elizabeth River Terminals, Inc.*, 354 F.2d 476 (4th Cir.1966), and to remove or adequately warn of such obstacles, e.g., *Berwind-White Coal Mining*

*Co. v. City of New York,* 135 F.2d 443 (2d Cir.1943).

It is true that the duty of a terminal operator extends only to the berth and to the approach to the berth and not to adjacent areas. *Trade Banner Lines, Inc. v. Caribbean S.S. Co.,* 521 F.2d 229 (5th Cir.1975). However, in the present case Belcher's own actions establish what waters should be considered the approach to the terminal. Even though it had no legal interest in the water between the southerly line of its leasehold of the berth area, it assumed sufficient control over that area to attempt to ensure a proper approach to the ship and barge terminal. It obtained soundings of the area. Then partly with and partly without permission of the Corps of Engineers it retained Weeks to conduct dredging operations. The dredging operations in the approach to the barge dock were designed to provide a minimum depth of 26 feet from the government channel to the berth area. When Sonat discovered the offending rock, Belcher first sought to persuade the Corps of Engineers to remove it, and, failing in that endeavor, proceeded to remove it itself.

Thus the approach in the present case was a widened 26 foot depth area. At the time of dredging Belcher failed to ascertain the existence of underwater obstacles in that area. It was put on notice that in all probability there was an underwater obstacle in the approach. Belcher failed to search for it or to warn users of the terminal of its existence. This was a serious breach of the terminal operator's duty to exercise reasonable diligence in ascertaining the conditions of the berth and its approaches and to remove or warn of underwater obstacles in the approaches.

Belcher cites *Creppel v. Shell Oil Co.,* 738 F.2d 699 (5th Cir.1984) as authority relieving it of responsibility. In that case the Court held that the holder of a mineral lease in the Gulf of Mexico is not liable to vessels which strike an obstruction in the waters subject to the lease which the lessee neither owns nor has placed there nor maintains. That case is totally inapposite to the present case. Belcher is not a mere lessee of navigable waters through which other vessels travel. Rather, Belcher is a terminal operator inviting vessels to use its berths and to pass through approaches maintained by it to get to the berths. As such it has recognized duties to its patrons whatever the state of the title to the berth and to the approaches may be.

Since in admiralty liability is determined using a so-called pure form of comparative negligence, Sonat is entitled to recover from Belcher an appropriate portion of the damages caused by the combined negligence of Belcher and Sonat. *United States v. Reliable Transfer,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). As noted above I have concluded that Belcher's negligence was 75 percent responsible for the grounding and Sonat's negligence was 25 percent responsible.

Total damages have been stipulated to be $535,000 exclusive of prejudgment interest. It is appropriate that prejudgment interest be paid from the last date on which Sonat made a major payment for repairs to the barge, namely, November 9, 1982. *In re Bankers Trust,* 658 F.2d 103 (3d Cir.1981). The average (annual) compounded weighted rate of interest which Sonat paid to its three major banks during the applicable period it borrowed funds was 10.85 percent and the annual simple interest rate paid to those banks during that period was 12.43 percent.

Using these figures Sonat's senior accountant computed prejudgment interest on the total amount of $535,000 to be $168,946.40, which, of course, will have to be apportioned to reflect the comparative negligence of the parties.

Having reached these conclusions it is unnecessary to consider the application of the Pennsylvania Rule, *The Pennsylvania v. Troop,* 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874), the applicability of New Jersey's law of public nuisance as applied to the unauthorized dredging and the applicability of the good samaritan rule set forth in Restatement (Second) of Torts, Section 323.

Belcher's counterclaim for indemnity for attorney's fees incurred by it must be dis-

missed. Its contention that Sonat should have voluntarily dismissed its action when it discovered that the offending rock was outside the area reported on chart 12333 as having a 26 foot depth is for the reasons previously stated without merit.

Sonat is requested to submit an appropriate form of judgment.