

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-20-1996

# In Matter Nautilus Motor Tanker

Precedential or Non-Precedential:

Docket 95-5126

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation
"In Matter Nautilus Motor Tanker" (1996). *1996 Decisions.* Paper 180.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/180

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5126


IN THE MATTER OF THE COMPLAINT OF
NAUTILUS MOTOR TANKER CO., LTD. AS OWNER OF THE
M/T BT NAUTILUS FOR EXONERATION FROM
OR LIMITATION OF LIABILITY,

Nautilus Motor Tanker Co., Ltd, Appellant


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 90-cv-02419)


Argued:  October 10, 1995
Before:  STAPLETON, McKEE and NORRIS, Circuit Judges

(Filed May 20, 1996)

JOHN J. REILLY (ARGUED)
Haight, Gardner, Poor & Havens
195 Broadway
New York, NY 10007

Counsel for Limitation Plaintiff-
Appellant Nautilus Motor Tanker Co.
Ltd.


RICHARD H. WEBBER (ARGUED)
Hill Rivkins Loesberg
  O'Brien Mulroy & Hayden
90 West St.
New York, NY 10006

Counsel for Limitation Defendant-
Appellee Coastal Oil New York, Inc.

OPINION OF THE COURT

McKEE, Circuit Judge

This dispute arises from the grounding of the tanker BT Nautilus, an 811 foot oil tanker owned by appellant Nautilus Motor Tanker Co., Ltd. ("Nautilus"). That grounding caused approximately 230,000 gallons of fuel oil to spill into the Kill van Kull waterway in Bayonne, New Jersey. Thereafter, Nautilus commenced a proceeding in the United States District Court for the District of New Jersey under the Limitation of Liability Act, 46 U.S.C. 181-189, in an effort to escape liability from various potential claimants including Coastal Oil New York, Inc. ("Coastal"), the owner of the terminal. Coastal filed a counterclaim against Nautilus alleging that Nautilus was solely responsible for the grounding. Following a nonjury trial, the district court entered judgment for Coastal and against Nautilus on Coastal's counterclaim.

In this appeal from that judgment, we are asked to determine whether the district court erred in admitting opinions and conclusions contained in a Coast Guard Report of the incident into evidence. We must also decide the relevance and possible application of a rather ancient rule of maritime law – the Pennsylvania Rule – to this controversy; and finally, we must decide whether the district court erred in concluding that Coastal's failure to provide navigational aids and information about the limits of its ship berth did not contribute to the accident. For the reasons that follow, we will affirm the ruling of the district court.

I.

We need only briefly set forth the underlying facts as they are detailed in the district court's opinion, In the Matter of the Complaint of Nautilus Motor Tanker Co., Ltd., 862 F.Supp. 1260 (D.N.J. 1994), and largely uncontested. On the morning of June 7, 1990, Moran Towing & Transportation, Co., Inc. ("Moran") dispatched two tugs and a docking pilot, Captain James Naughton, to assist BT Nautilus Captain Albert Frank Ainscough in docking his vessel at Coastal's terminal in Bayonne, New Jersey. As the Nautilus neared the terminal, it ran aground.

On June 18, 1990, Nautilus filed a petition in the district court seeking exoneration and/or limitation of its liability under the Limitation of Liability Act, 46 U.S.C. 181-189. Coastal responded by filing a claim against Nautilus, and Nautilus responded by seeking damages for Coastal's alleged negligence in causing the grounding.

At the ensuing bench trial on Coastal's counterclaim, Nautilus argued that Coastal "had breached its duty as a wharfinger because the vessel either grounded in the ship berth or, if it grounded outside the ship berth, the approach to the berth was unsafe." Appellant's Brief at 5. Coastal countered by arguing that the grounding was a direct consequence of negligent navigation by the vessel's captain and the docking pilot.

On September 27, 1994, the district court issued its findings of fact and conclusions of law. The court found that the BT Nautilus ran aground "at least 125 feet east of the

Coastal New York ship berth," Nautilus, 862 F.Supp. at 1268, and that Nautilus had failed to prove by a preponderance of the evidence that any of Coastal's alleged negligent acts were a proximate cause of the grounding.  Accordingly, the district court entered judgment in Coastal's favor, and this appeal followed.

Nautilus challenges that judgment on three grounds.  First, Nautilus contends that the district court erred in admitting opinions and conclusions contained in a Coast Guard Report of this incident.  Second, Nautilus argues that the Pennsylvania Rule created a burden-shifting presumption that Coastal's statutory violations caused the grounding.  Finally, Nautilus argues that the district court clearly erred in finding that Coastal's failure to provide navigational aids and information on the limits of its ship berth did not contribute to the grounding.

We have jurisdiction pursuant to 28 U.S.C.   1292(a)(3), which authorizes an appeal from an interlocutory order determining the rights and liabilities of the parties to admiralty cases.

## II.
### A. The Admissibility of the Coast Guard Report.

Coast Guard regulations require Coast Guard personnel to conduct an investigation, and prepare a report following marine casualties and accidents. See 46 C.F.R.   4.07 (1994). Accordingly, the United States Coast Guard investigated the June 7, 1990, grounding of the Nautilus and issued a public report that stated in part:

> The apparent cause of this grounding was failure on the part of the Docking Pilot to maintain the BT NAUTILUS within the navigable limits of the channel . . .[t]he docking pilot was not familiar with the shape or dimensions of the dredged underwater basin leading from the channel to the Terminal.
>
> Except as noted above there is no evidence of. . . misconduct, inattention to duty, negligence, or willful violation of law or regulation. . .nor evidence that any personnel of the Coast Guard, or of any other federal agency, or any other person contributed to this casualty. . .

Coast Guard Report ("Report")   2, 18.  At trial, Coastal offered the entire Report into evidence under the exception to the hearsay rule for public records, FRE 803(8)(C).  The court received the report over the objection of Nautilus. That objection was based upon a provision in the Coast Guard regulations that states:

> investigations of marine casualties. . .are for the purpose of taking appropriate measures for promoting safety of life and property at sea, and are not intended to fix civil or criminal responsibility.

46 C.F.R. 4.07-1(b). Nautilus argued that the foregoing portions of the Report held "no evidentiary relevance other than to fix liability. . ." , Appellant's Brief at 14, and should therefore be excluded under 4.07-1(b).

The district court concluded that the entire Report fit within the confines of FRE 803(8)(C) and deemed it admissible irrespective of 46 C.F.R. 4.07-1(b).

On appeal, Nautilus relies principally upon Huber v. United States, 838 F.2d 398 (9th Cir. 1988), and its progeny to argue that the district court erred in admitting the Report into evidence. In Huber, two crew members drowned when their yacht sank north of San Francisco Bay. The surviving crew member joined decedents' representatives in a suit against the Coast Guard for failure to assist the vessel. At trial, plaintiffs sought to admit two Coast Guard Reports prepared in the aftermath of the accident. The government objected and argued that the conclusions and recommendations in the Reports were barred by 46 C.F.R. 4.07-1(b). The court overruled the government's objection, and allowed the Reports into evidence as admissions of a party opponent under FRE 801(d)(2).

On appeal, the Court of Appeals for the Ninth Circuit reversed. The court held that, under section 4.07-1(b), "the Coast Guard investigating officers' conclusions and recommendations. . .[are] inadmissible as evidence in civil proceedings arising out of accidents covered by the investigation reports." Huber, 838 F.2d at 402. In reaching this result, the court first emphasized the necessity of such a rule under the circumstances of the suit before it:

> A Coast Guard investigator might feel less free
> to suggest appropriate measures 'for promoting
> safety of life and property at sea' if he thought
> that any suggestion of additional precautions
> might result in imposing pecuniary liability
> on the government.

Id. at 402-403 (citing Reliable Transfer Co. v. United States, 53 F.R.D. 24, 25 (E.D.N.Y. 1971) ). The court also noted a perceived similarity between 46 C.F.R. 4.07-1(b) and federal enactments such as 49 U.S.C. 1903(c) -- which bars the admission into evidence of accident reports prepared by the National Transportation Safety Board. The court noted that the only difference between the latter statute, and the former regulation is that

> in one the Coast Guard acted pursuant to authority
> from Congress. . .and in the other, Congress acted
> directly. . . Either way, the result is the same:
> all or portions of the reports are excluded from
> evidence on authority of Congress.

Id. at 403. Other courts have relied on the reasoning of Huberto bar the admission of opinions and conclusions in Coast Guard Reports. See In the Matter of the Petition of Cleveland Tankers, Inc., 67 F.3d 1200, 1208 (6th Cir. 1995) (Barring opinions and conclusions in a Coast Guard Report); Yap v.

Controlled Parasailing of Honolulu, Inc., 873 P.2d 1321, 1328 (Haw. 1994) (Same).

Nautilus argues that since the Coast Guard acted pursuant to congressional authority, 46 C.F.R. 4.07-1(b) must preclude the admissibility of paragraphs two and eighteen of the Coast Guard Report. Appellant's Reply Brief at 2. We do not agree.

First, the government is not a party to this litigation. Thus, unlike in Huber, the Coast Guard has no interest in the outcome, and the policy justification for the regulation's evidentiary bar -- ensuring frank disclosure by Coast Guard investigators -- is completely removed. The investigators here have no bias that may interfere with a full, fair, or accurate report of their findings or affect the course of their investigation.

Second, and more fundamentally, we affirm the ruling of the district court because it is axiomatic that federal regulations can not "trump" or repeal Acts of Congress. See e.g., McComb v. Wambaugh, 934 F.2d 474, 481 (3d Cir. 1991) ("No regulation can override legislative intent. . ."). 46 C.F.R. 4.01-1(b) is not an Act of Congress; it is a federal regulation. In contrast, the Federal Rules of Evidence were enacted by Congress and must be regarded by this Court as any other federal statute. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993); see also, 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence 5013 at 120 (1977) ("Since the Rules of Evidence were enacted by Congress, no question of delegated power is involved.").

Although initially proposed by the Supreme Court, the Federal Rules of Evidence were enacted into law by Congress, Act of Jan. 2, 1975, Pub.L. 93-595, 88 Stat. 1926 (1975), and they "govern proceedings in the courts of United States." FRE 101; see also Salas by Salas v. Wang, 846 F.2d 897, 904 (3d Cir. 1988). Although promulgated pursuant to congressional authority, 46 C.F.R. 4.07-1(b) remains a regulation. The delegation of congressional power that authorized its promulgation did not transform the regulation into an Act of Congress, nor allow it to prevail over contrary provisions of duly enacted statutes. Accordingly, the Coast Guard may not, through its regulations, limit the authority of Congress to prescribe and enforce rules for the admissibility of evidence in the federal courts. See e.g, Romero v. U.S., 153 F.R.D. 649, 652 (D.Colo. 1994) (The Federal Rules of Evidence override an Army regulation, 32 C.F.R. 515.42, purporting to limit an Army doctor's expert testimony.).

FRE 402 provides the baseline for determining the admissibility of evidence in the federal courts. See e.g., Daubert, 509 U.S. at __, 113 S.Ct. at 2793. That rule provides that:

> All relevant evidence is admissible, except as
> otherwise provided by the Constitution of the
> United States, by Act of Congress, by these rules,
> or by other rules prescribed by the Supreme Court
> pursuant to statutory authority. . .

FRE 402. FRE 401 defines "relevant" evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Thus, the contents of the Coast Guard Report were directly relevant to the issues before the district court, and therefore admissible under FRE 402 unless barred by the Constitution, an Act of Congress, a Federal Rule of Evidence or a rule prescribed by the Supreme Court pursuant to statutory authority. Clearly, no Coast Guard regulation can claim such a status. The position urged upon us by Nautilus would cause us to judicially amend this enactment by replacing the phrase "by Act of Congress" with language similar to: "by Act of, or pursuant to the authority of, Congress." Since the Report was prepared by a government agency, its admissibility was appropriately considered under Rule 803(8), the public record exception. See e.g., United States v. Versaint, 849 F.2d 827, 831 (3d Cir. 1988). Accordingly, we decline the invitation to follow the lead of Huber, and its progeny.

In Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed. 445 (1988), the Supreme Court considered whether the public records exception to the hearsay rule, Rule 803(8)(C), extended to conclusions and opinions in public reports. There, the court considered the admission into evidence of a Judge Advocate General Report on a United States Navy plane crash during a jury trial. The Court concluded that Rule 803(8)(C) did not preclude the introduction of opinions and conclusions in such reports so long as two criteria were met. First, all statements in such a report must be based on factual investigation. Id. at 167, 109 S.Ct. at 449. Second, any portion of the report that is admitted must be sufficiently trustworthy. Id. at 167, 109 S.Ct. at 449. The Supreme Court cited with approval four non-exhaustive factors to be used in determining whether a report is sufficiently trustworthy:

> (1) the timeliness of the investigation; (2) the
> investigator's skill and experience; (3) whether
> a hearing was held; and (4) possible bias when
> reports are prepared with a view to possible
> litigation.

Id. at 168 n.11; 109 S.Ct. at 449. Here, the district court properly applied these criteria, concluded that they were satisfied and admitted paragraphs two and eighteen of the Coast Guard Report under Rule 803(8)(C). We do not think that the court erred in that analysis. Moreover, we note that public reports are presumed admissible in the first instance and the party opposing their introduction bears the burden of coming forward with enough "negative factors" to persuade a court that a report should not be admitted. Beech Aircraft, 488 U.S. at 167 109 S.Ct. at 448. Courts have routinely admitted conclusions and recommendations in Coast Guard Reports under Beech Aircraft, irrespective of 46 C.F.R. 4.07-1(b). See Puerto Rico Ports Authority v. M/V Manhattan Prince, 897 F.2d 1, 8 (1st Cir. 1990) (Affirming the district court's admission of three conclusions in

a Coast Guard Report); Fox v. United States and Robert Anderson, Civil No. C-94-0491, slip op. at 4-8 (N.D.Cal. February 14, 1996) (Coast Guard report admissible under Rule 803(8) so long as report meets trustworthiness standard of Beech Aircraft); Wright v. Daviesyndicate, Inc., 1993 WL 246020, *8,*9 n.10 (E.D.Pa. 1993) (Conclusions contained in Coast Guard Report admitted without comment); Complaint of Kenneth I. Munyan, 143 F.R.D. 560, 565-66 (D.N.J. 1992) (Conclusions and opinions in Coast Guard Report deemed admissible under Rule 803(8)(C)); Taylor v. Bouchard, 1991 WL 107279, *4 (S.D.N.Y. 1991) (Opinions and conclusions in Coast Guard Report admitted).

Accordingly, we affirm the district court's evidentiary ruling that the challenged portions of the Report were admissible under Rule 803(8)(C).

## B. The Pennsylvania Rule.

The Pennsylvania Rule is named for the famous admiralty case in which it was first announced. The Rule provides that when:

> a ship at the time of a collision is in actual
> violation of a statutory rule intended to prevent
> collisions, it is no more than a reasonable
> presumption that the fault, if not the sole cause,
> was at least a contributory cause of the disaster.
> In such a case, the burden rests upon the ship of
> showing not merely that her fault might not have
> been one of the causes, or that it probably was
> not, but that it could not have been.

The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). While the presumption that arises under the Rule is rebuttable, Id. at 130, it is by its very language, a weighty one. Although the Rule originally applied only to collisions between ships, it has been reformulated to apply to any statutory violator who is a party to a maritime accident. See e.g., Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1471 (5th Cir. 1991).

In United States v. Nassau Marine, 778 F.2d 1111 (5th Cir. 1985), the court articulated a test for determining when to apply the presumption of the Pennsylvania Rule. That Court held that three elements must exist: (1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent. Id. at 1116-1117; Folkstone Maritime v. CSX Corporation, 64 F.3d 1037, 1047 (7th Cir. 1995). If each of these criteria are satisfied, a party is entitled to a presumption that a statutory violation of a defendant caused, or at least contributed to, the injury or damage complained of. However, a statutory violator may rebut the presumption of the Rule by making a clear and convincing showing that the violation could not have been a proximate cause of the collision, Cliffs-Neddrill v. M/T Rich Duke, 947 F.2d 83, 86 (3d Cir. 1991), or by demonstrating that the accident would have occurred despite the statutory violation.

See e.g., Folkstone Maritime, 64 F.3d at 1047.

The Rule casts its shadow on this case because it is undisputed that in 1990, Coastal engaged in over-dredging in its barge berth beyond the scope of its U.S. Army Corps of Engineers permit in violation of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. 403. The dredged material was displaced into Coastal's ship berth causing "high spots" or navigational obstructions in that area.

Nautilus theorizes that the forward part of the BT Nautilus entered Coastal's ship berth on the morning of June 7, 1990 and struck one of these high spots, Transcript of Oral Argument at 23, thereby causing the vessel to rotate so that its midpoint struck bottom at a point outside of the ship berth. Id. at 23. However, Nautilus argues that, even assuming the BT Nautilus ran aground outside Coastal's ship berth, a grounding within the limits of the Coastal Terminal should implicate the Pennsylvania Rule and require reversal of the burden of proof. Appellant's Brief at 29.

The district court rejected Nautilus' theory of the grounding and refused to apply the Pennsylvania Rule. The court concluded that the Rule did not apply since Nautilus had presented no evidence that any impact had occurred in or near Coastal's ship berth -- the location of the dredging violations.

> If the BT Nautilus had hit "high spots" or some obstruction in the ship berth, then Coastal would have the burden of proving its statutory violation could not have caused the "high spots" or the obstruction. But the BT Nautilus did not ground in the ship berth. It grounded in an area well to the east, outside the federal channel and outside the ship berth. Nautilus has never contended this area was impacted by the dredging in the Coastal barge berth.

Nautilus, 862 F.Supp. at 1273. The district court thus required some "nexus between the statutory violation and the accident", Id. at 1274, as a condition precedent to applying the Rule. In doing so, the court relied upon the holding in Gosnell v. United States, 262 F.2d 559 (4th Cir. 1958).

In Gosnell, the United States Navy violated the Wreck Statute, 33 U.S.C. 409, by towing a barge at too great a speed -- causing it to sink in Delaware Bay. Eight days later and nearly four miles from the site of the casualty, a fishing vessel sunk after striking an unseen object in the same bay. The owner of the fishing vessel brought a claim against the United States, and the court of appeals affirmed the district court's refusal to apply the Pennsylvania Rule in the absence of any evidence of a nexus between the statutory violation and the accident. Id. at 564. The court stated:

> Any plaintiff. . .who seeks to hold a defendant liable. . .must show: (1) the physical cause of the harm; (2) fault on the part of the person sought to be held responsible; and (3) a causal connection between such fault and the physical cause. . .

Gosnell, 262 F.2d at 563 (quoting The YFNX–6, 156 F.Supp. 325, 331 (D.Md. 1957) ).  Thus, in cases where there is no clear link between the statutory violation and the casualty, the party seeking to take advantage of the Rule has been required to make some showing that the statutory violation may have had some relation to the accident.

Indeed, a contrary rule, such as is urged upon us by appellants, would result in a presumption of liability following any statutory violation no matter how remote or inconsequential such a violation may have been to the subsequent accident. Neither precedent nor logic compels such a drastic result.  The Rule was clearly intended to aid those who had been injured as a result of the statutory violation of a defendant in admiralty. We do not believe it was intended to increase the likelihood of liability no matter how remote and unrelated an injury to a statutory violation.

> The Pennsylvania Rule was not meant to be a hard
> and fast rule that requires a finding of fault
> for statutory violations no matter how speculative,
> improbable, or remote.

Cliffs–Neddrill, 947 F.2d at 88.

In another context we have stated "'[w]here stops the reason, there stops the rule.'" Aetna v. Barthelemy, 33 F.3d 189, 193 (3rd Cir., 1994) (quoting Karl N. Llewellyn,  Jurisprudence: Realism in Theory and Practice 217 (1962)).

Here, the district court found that the point of impact of the BT Nautilus was at least 125 feet east of Coastal's ship berth where the illegal dredging operations had occurred.  That finding was not clearly erroneous.  See e.g., Haines v. Liggett Group, Inc., 975 F.2d 81, 92 (3d Cir. 1992)  (Under the clearly erroneous standard, findings of fact made in actions tried by the court without a jury may be reversed only if such findings are "completely devoid of minimum evidentiary support displaying some hue of credibility, or. . .bear no rational relationship to the supportive evidentiary data.").  Here, expert commercial divers hired by both parties concluded that the vessel ran aground to the east of the Coastal ship berth and outside the federal channel.  The eyewitness testimony of a Coastal dockworker, Theodore Rovatsos, supported that conclusion.  No diver ever found any evidence of any kind to support Nautilus' theory of impact in the Coastal ship berth.  Moreover, Nautilus could not demonstrate that the forward 400 feet of the vessel were damaged in any way on the morning of June 7, 1990.  Common sense suggests that, had the BT Nautilus first struck ground in the ship berth as Nautilus suggests, the forward part of the vessel would sustain some damage, or reflect some trace of the grounding. Yet, there was no evidence of even minor scratching of the paint on the forward part of the BT Nautilus.

Since the effects of Coastal's statutory violation were limited to an area (i.e., the ship berth) nearly 125 feet from the only point of grounding impact, we refuse to require the mechanical application of the Pennsylvania Rule.  Moreover, even

assuming the Rule applied here, we believe Coastal rebutted the presumption of causation with overwhelming evidence that its illegal dredging could not have been a proximate cause of the June 1990 grounding because the grounding occurred outside that berth.  See e.g., U.S. Fire Insurance Co. v. Allied Towing, 966 F.2d 820, 825 (4th Cir. 1992) (Whether Pennsylvania Rule was applied is irrelevant since party proved at trial that his ship's failure to have its lights on could not have been cause of collision); Alter Barge Line v. TPC Transportation, 801 F.2d 1026, 1029 (8th Cir. 1986) (Even assuming that the overtaken tug committed a statutory fault, failure to apply the Pennsylvania Rule is irrelevant since evidence clearly indicated that overtaking tug was sole cause of collision).

        C. Coastal's Duty to Provide a Safe Approach.

Finally, Nautilus contends that Coastal breached its duty of reasonable diligence as a wharfinger.  In particular, appellant argues that Coastal "breached its duty to provide a safe approach by failing to install navigational aids and provide information about the limits of its Ship Berth."  Appellant's Brief at 33.  However, the district court concluded that Coastal's alleged omissions were not a proximate cause of the June 7, 1990 grounding.  Nautilus, 862 F.Supp. at 1276.  We review that finding under a "clearly erroneous" standard.  Fed.R.Civ.P. 52(a).

Under admiralty law, it is well-settled that a wharfinger who invites a party to use its dock facilities is not the guarantor of the vessel's safety.  However, the wharfinger is "bound to exercise reasonable diligence in ascertaining the condition of the berths and if there is any dangerous obstruction, to remove it, or to give due notice of its existence to vessels about to use the berths."  Smith v. Burnett, 173 U.S. 430, 433, 19 S.Ct. 442, 443, 43 L.Ed. 756 (1899).  A wharfinger also has a duty to maintain a safe approach.  Id. at 436, 19 S.Ct. at 444; Trade Banner Line, Inc. v. Caribbean Steamship Co., 521 F.2d 229, 230 (5th Cir. 1975); Sonat Marine Inc. v. Belcher Oil Co., 629 F.Supp. 1319, 1327 (D.N.J. 1985), aff'd 787 F.2d 583 (3d Cir. 1986).  However, there is no duty to ensure safe surroundings or warn of hazards merely in the vicinity.  Trade Banner Line, 521 F.2d at 230.  In short, a vessel should be able to enter, use and exit a wharfinger's dock facilities without being exposed to dangers that cannot be avoided by reasonably prudent navigation and seamanship.

We do not find the district court's determination as to causation to be clearly erroneous.  First, marine navigational charts on board the BT Nautilus (British Admiralty Chart No. 2753), and known to its docking pilot clearly and accurately depicted the area in which the BT Nautilus ran aground as a shallow area.  Moreover, a moving vessel and her owner are subject to a presumption of negligence when the vessel strikes a well-charted, stationary object or obstruction.  The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943 (1895); City of Boston v. S.S. Texaco, 773 F.2d 1396, 1398 (1st Cir. 1985).

In addition, substantial evidence indicated that unofficial aids were sufficient for navigating a safe approach to the

Coastal ship berth.  Although Nautilus' experts maintained that the absence of aids marking the boundary of the ship berth made the approach difficult, the district court explicitly credited the testimony of Coastal's expert, Captain Jay D. Bolton, and eyewitness, Theodore Rovatsos, as to the existence and adequacy of unofficial aids.  The district court's conclusions regarding such testimony, based on assessments of witness credibility, are deserving of the highest degree of appellate deference.  Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518 (1985).  Moreover, Coast Guard investigators, who would be expected to target such dangers, never mentioned any inadequacy of navigational aids here.  Docking pilot Naughton even testified that a parallel dock (the IMTT Facility), similar in all relevant respects, was safe despite the absence of any aids to navigation beyond those existing at the Coastal Terminal.  Furthermore, we cannot fail to note that throughout the period of the grounding, similar tankers docked without incident or objection to the absence of official navigational aids or information on the limits on Coastal's ship berth.

Finally, it is undisputed that Captain Ainscough maintained a copy of The Guide to Tanker Ports on board the BT Nautilus at the time of the grounding.  Although that Guide and its procedures for docking at the Coastal Terminal were well-known to both Ainscough and Naughton, neither chose to follow its instructions on the morning of the grounding.  The BT Nautilus departed for the Coastal Terminal nearly three hours before the time recommended by the Guide.  The evidence before the district court suggests that, had Ainscough simply left at the suggested time, his vessel would have encountered minimal tidal currents and superior docking conditions.  Moreover, having arrived at a time of strong tidal currents, Naughton compounded the error when he failed to utilize the "breasting in" approach recommended by the Guide.

The district court's conclusion that this grounding was not caused by a breach of duty on the part of Coastal is, therefore, firmly supported by this record.

## IV.

For the foregoing reasons, we will affirm the judgment of the district court.

IN THE MATTER OF THE COMPLAINT OF
NAUTILUS MOTOR TANKER, No. 95-5126

STAPLETON, Circuit Judge, Concurring:

I join the opinion of the court.  I write separately only because I believe there is an additional, and equally persuasive, reason why   4.07-1 of the Coast Guard Regulations did not bar the admission of the investigation report in this case.  It seems apparent to me that the Secretary, in adopting this regulation, did not intend to prescribe a rule governing the admission of evidence in a court of law.

Section 6301 of Title 46 of the United States Code provides:

 6301.  Investigation of marine casualties

The Secretary shall prescribe regulations for the immediate investigation of marine casualties under this part to decide, as closely as possible --

(1) the cause of the casualty, including the cause of any death;

(2) whether an act of misconduct, incompetence, negligence, unskillfulness, or willful violation of law committed by any individual licensed, certificated, or documented under part E of this subtitle has contributed to the cause of the casualty, or to a death involved in the casualty, so that appropriate remedial action under chapter 77 of this title [relating to license suspension and revocation proceedings] may be taken;

(3) whether an act of misconduct, incompetence, negligence, unskillfulness, or willful violation of law committed by any person, including an officer, employee, or member of the Coast Guard, contributed to the cause of the casualty, or to a death involved in the casualty;

(4) whether there is evidence that an act subjecting the offender to a civil penalty under the laws of the United States has been committed, so that appropriate action may be undertaken to collect the penalty;

(5) whether there is evidence that a criminal act under the laws of the United States has been committed, so that the matter may be referred to appropriate authorities for prosecution; and

(6) whether there is need for new laws

or regulations, or amendment or repeal of existing laws or regulations, to prevent the recurrence of the casualty.

Section 6305 further provides that the Secretary shall prescribe regulations concerning the reports of such investigations and requires that those reports be "made available to the public, except to the extent that they contain information related to the national security."

Pursuant to these directives, the Secretary has promulgated 46 C.F.R. 4.07-1, the prefatory section to a Subpart relating to "Investigations." It provides:

4.07-1 Commandant or District Commander to order investigation.

(a) The Commandant or District Commander upon receipt of information of a marine casualty or accident, will immediately cause such investigation as may be necessary in accordance with the regulations in this part.

(b) The investigations of marine casualties and accidents and the determinations made are for the purpose of taking appropriate measures for promoting safety of life and property at sea, and are not intended to fix civil or criminal responsibility.

(c) The investigation will determine as closely as possible:

(1) The cause of the accident;

(2) Whether there is evidence that any failure of material (either physical or design) was involved or contributed to the casualty, so that proper recommendations for the prevention of the recurrence of similar casualties may be made;

(3) Whether there is evidence that any act of misconduct, inattention to duty, negligence or willful violation of the law on the part of any licensed or certificated man contributed to the casualty, so that appropriate proceedings against the license or certificate of such person may be recommended and taken under title 46, U.S. Code, section 239;

> (4)  Whether there is evidence that
> any Coast Guard personnel or any
> representative or employee of any
> other government agency or any
> other person caused or contributed
> to the cause of the casualty; or,
>
> (5)  Whether the accident shall be
> further investigated by a Marine
> Board of Investigation in
> accordance with regulations in
> subpart 4.09.

The purpose of   4.07-1(b) and (c) is to explain, for the benefit of those conducting investigations and those reading and using investigation reports, the limited purposes for which Coast Guard investigations of casualties are conducted.  The last clause of   4.07-1(b) explains that they are "not intended to fix civil or criminal responsibility."  This means, among other things, that the ultimate determination of licensing issues is left to suspension or revocation proceedings, civil penalty issues to civil penalty proceedings, and criminal culpability issues to criminal proceedings.  If there was any intent with respect to other civil liability issues, I am confident that the intent was to advise that the ultimate determination of issues of civil liability is reserved for civil judicial proceedings and that the information contained in a Coast Guard investigation report should be evaluated and utilized with the understanding that the focus of the investigation was not on assigning the responsibilities of the participants inter se.

I am also confident that, if the Secretary had meant   4.07-1(b) to govern the admission of evidence in court, he would have chosen a far less tortuous way of saying so.  The models available to him, as he is likely to have been aware, are numerous.  See 42 U.S.C.   2240 ("No report by any licensee [of the NRC] of any incident arising out of or in connection with a licensed activity made pursuant to any requirement of the Commission shall be admitted as evidence in any suit or action for damages growing out of any matter mentioned in such report."); 49 U.S.C.   1441(e) (repealed Pub. L. No. 103-272, 7(b), July 5, 1994, 108 Stat. 1379) ("No part of any report or reports of the National Transportation Safety Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."); 45 U.S.C.   33 (repealed Pub. L. No. 103-272,   7(b), July 5, 1994, 108 Stat. 1379) ("[Neither reports of Railroad accidents by the director of locomotive inspection nor reports of his investigation] shall be admitted as evidence or used for any purpose in any suit or action for damages growing out of any matter mentioned in said report or investigation."); see also H.R. 1361, 104th Cong., 1st Sess.   414 (1995) ("Notwithstanding any other provision of law, any opinion, recommendation, deliberation, or conclusion

contained in a report of a marine casualty investigation conducted under section 6301 of this title with respect to the cause of, or factors contributing to, the casualty set forth in the report of the investigation is not admissible as evidence or subject to discovery in any civil, administrative, or State criminal proceeding arising from a marine casualty, other than with the permission and consent of the Secretary of Transportation, in his or her sole discretion.").

In The Matter of the Complaint of Nautilus Motor Tanker Co.
No. 95-5126

NORRIS, Circuit Judge, concurring in part, dissenting in part, and dissenting from the judgment:

I join the majority opinion except in its holding that conclusions in a Coast Guard report of a marine casualty investigation are admissible as evidence in civil cases. In so holding, the majority creates a square conflict with the Sixth and Ninth Circuits, the only other circuits that have addressed and decided this question.

In In re Cleveland Tankers, Inc., 67 F.3d 1200, 1208 (6th Cir. 1995), the Sixth Circuit held that under the Coast Guard regulation at issue, 46 C.F.R. 4.07-1(b), conclusions in Coast Guard reports are not admissible. The Sixth Circuit reasoned that

> the function of the Coast Guard
> reports is altogether different
> from that of fixing liability. The
> Coast Guard report is, to a great
> extent, forward-looking, since it
> is meant in part to aid in
> developing rules to make shipping
> safer. In a lawsuit, a court must
> look backward to facts and rules as
> known to the actors at the time of
> the accident. Introducing the
> Coast Guard's conclusions may
> confuse the two sorts of inquiries.

Id. (citation omitted).

In Cleveland Tankers, the Sixth Circuit followed the Ninth Circuit's decision in Huber v. United States, 838 F.2d 398, 403 (9th Cir. 1988). The majority attempts to distinguish Huber on the ground that the Coast Guard was a party to that action. However, the Sixth Circuit expressly rejected that distinction

and held that "Huber's reasoning is sound" even in cases in which the Coast Guard has no interest. Cleveland Tankers, 67 F.3d at 1208.

In creating a conflict with the Sixth and Ninth Circuits, the majority relies on Puerto Rico Ports Auth. v. M/V Manhattan Prince, 897 F.2d 1, 8 (1st Cir. 1990). That reliance is misplaced. In Manhattan Prince, the First Circuit neither addressed nor decided the question whether 46 C.F.R. 4.07-1(b) bars the admission of conclusions in Coast Guard reports as evidence. The First Circuit made no reference to 46 C.F.R. 4.07-1(b), apparently because it was not cited by either party. See id. ("Both sides agree that Beech Aircraft Corp. v. Rainey, 488 U.S. 153 (1988) controls the admissibility of the report."). Rather, the First Circuit analyzed the admissibility of conclusions in a Coast Guard report solely under Federal Rule of Evidence 803.

Other than Manhattan Prince, the only cases cited by the majority are four district court decisions, three of which are unpublished and only one of which addresses the question whether 46 C.F.R. 4.07-1(b) bars the admission of conclusions in Coast Guard reports as evidence. In Complaint of Kenneth I. Munyan, 143 F.R.D. 560, 565-66 (D.N.J. 1992), the only published decision cited by the majority, the court made no reference to 46 C.F.R. 4.07-1(b), and analyzed the admissibility of a Coast Guard report solely under Federal Rule of Evidence 803.

The only district court decision cited by the majority that addresses the question whether 46 C.F.R. 4.07-1(b) bars the admission of conclusions in a Coast Guard report is an unpublished order on a motion in limine in Fox v. United States, No. C-94-0941, slip op. at 4-8 (N.D. Cal. Feb. 12, 1996). There, the district court declined to apply Huber and decided that 46 C.F.R. 4.07-1(b) did not bar the admission of Coast Guard conclusions under Beech Aircraft v. Rainey, 488 U.S. 153 (1988). Like the majority here, the district court decided that an agency regulation "cannot trump congressionally enacted rules of evidence." Fox, slip op. at 7. With all due respect, I believe that a specific agency regulation can create an exception to a general rule of evidence, as long as the agency acts within the scope of the rulemaking authority granted to it by Congress. In promulgating 46 C.F.R. 4.07-1(b), the Coast Guard was clearly acting within the scope of its authority. As the Ninth Circuit put it,

> [t]he only difference between the Coast Guard regulation banning the use of accident reports as evidence and a statute such as 49 U.S.C. 1441(e) banning the use of aviation accident reports as evidence is that in one the Coast Guard acted pursuant to authority from Congress to pursue safety on the high seas,

and in the other, Congress acted directly in promoting air safety. Either way, the result is the same: all or portions of the reports are excluded from evidence on authority of Congress.

Huber, 838 F.2d at 403.

I respectfully dissent.